## ZALL v. NATIONAL LABOR RELATIONS BOARD.

## NATIONAL LABOR RELATIONS BOARD v. ZALL.

### No. 13031.

United States Court of Appeals
Ninth Circuit.

March 17, 1953.

Rich, Carlin & Fuidge, Marysville, Cal., for petitioners.

George J. Bott, Gen. Counsel, National Labor Relations Board, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Louis Schwartz and Fannie Boyls

Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before MATHEWS, STEPHENS and ORR, Circuit Judges.

ORR, Circuit Judge.

American Federation of Grain Millers International Union, hereinafter referred to as the Union, filed a charge with the National Labor Relations Board, hereinafter referred to as the Board, charging Sam Zall, an individual doing business as Sam Zall Milling Company, hereinafter referred to as Zall, with violation of § 8(a)(1) and (5) of the Labor Management Relations Act of 1947, hereinafter called the Act, 29 U.S.C.A. § 158(a)(1) and (5).

Zall complains that the Board erred in finding that it, Zall, was engaged in interstate commerce or in business activities which would have a pronounced effect on commerce.

Zall is engaged in the production and sale of animal and poultry feed. In 1949 it purchased materials in excess of $250,000. Of this amount more than $90,000 was expended for materials shipped from points in the United States outside of the state of California.

During 1949 Zall sold in California poultry feed valued at more than $75,000 to a firm which used the feed in production of poultry and eggs. This firm shipped to points outside the state of California eggs and poultry valued at more than $60,000. Feed purchased from Zall is fed to breeding stock, not to baby chicks. The breeding stock is not shipped out of the state but hatching eggs are. The Board found on this state of facts that Zall "was engaged in the manufacture of a product closely connected with, and necessary to, the production of goods for commerce and that unfair labor practices on the part of respondent [Zall] might very well lead to labor disputes which would burden and obstruct commerce." We agree. Cf. McComb v. Super-A Fertilizer Works, Inc., 1 Cir., 1948, 165 F.2d 824.

The Board further found: One, that Zall had violated § 8(a)(1) and (5) of the Act, 29 U.S.C.A. § 158(a) (1) and (5), in that it had refused to honor the Union's request to bargain. Two, that it had dealt directly with its employees and unilaterally changed the terms of employment in face of the fact that the employees had selected the Union to represent them which Zall then well knew.

Zall challenges the finding we have designated as One, on the ground that the evidence failed to show a clearcut request to negotiate. The evidence relied on by the Board to support this challenged finding impresses us as being unsubstantial. By September 26, 1950 organizers for the Union had succeeded in getting one employee of Zall to sign an application for membership in the Union. With this one application in their possession (obviously insufficient to constitute the Union a bargaining agent) the organizers called upon Sam Zall and informed him that they intended to organize his shop. Sam Zall said in response: "I don't want a union here and my people do not need a union." One of the organizers told Sam Zall that he would change his views after they were better acquainted. Gamble, one of the union organizers, gave Sam Zall a copy of the Union's master agreement which the Union regularly used as basis of negotiation and asked Sam Zall to study it so they could discuss it a week or so later. We fail to find a refusal to bargain violative of the Act in the foregoing conversation and circumstances, for the simple reason that at that time the organizers were not authorized to represent the employees and an unauthorized organizer cannot validly request an employer to bargain.

On October 3, 1950, a majority of the employees having signed cards, the organizers returned to the plant and held a further conversation with Sam Zall. Mr. Gamble testified to a conversation had with Sam Zall.[1] There is nothing in Mr. Gamble's

---

1. "A. I asked Mr. Zall if he had read and studied the contract. He said 'Yes,' he had. I asked him what he thought of it, and he said he thought it was a very good

version of the conversation to indicate that the parties were talking about anything other than an election. The Board seized upon a statement made by Sam Zall during this conversation in an effort to supply substance to their finding that he refused to negotiate.[2]

It seems clear that the organizers had in mind, when this conversation occurred, one subject only, viz.: to secure consent for authority to represent the employees without the necessity of holding an election. That was what Sam Zall was talking about when he stated in his testimony that they asked him to negotiate. While it seems apparent that the Union at the time, by reason of the signed cards, had authority to represent the employees in negotiation, it is equally apparent that the organizers were not aware of that fact else why would they be talking about an election to give the Union that status. This is

contract, but that was one man's opinion. I asked him if he would consent to a joint election which was customary between unions and employers for the purpose of recognition of the union as his employees' representative. He stated that he had already previously stated his position that he did not want a union in the plant. I asked him if he would consent to an election if we had over thirty per cent.

"Q. Thirty per cent what? A. Thirty per cent of the membership signed up. Signed up means the authorization cards. He says, 'Have you got them?' I said 'Yes.' He said, 'Let me see them.' I said, 'Oh, no.' I said, 'That is for the Board, and if the Board decides to let you see the authorization cards, that will be another matter.' He stated again that he had previously made himself known on this matter and at that time we should have, and he went into the plant and we left the premises.

"Q. You say he stated that he had previously made himself known on this matter. Are you attempting to repeat his words? A. I was attempting to repeat his words as nearly as I possibly could, yes.

"Q. Is that all you remember about your conversation with him? A. That is all at this time that I can remember.

"Q. Did you discuss petitioning for an election? A. Well, I did discuss petitioning for an election.

"Q. What did you say in that connection? A. I said to him, I says—but that was after I had made the statement that if we had over thirty per cent of the signatures and he asked me if—we have already gone through that—he says, 'Go ahead and have your election.' And he says, 'That is when our good relations will cease, when you have an election.'"

2. "A. I don't recall word for word what was said. Mr. Gamble or Mr. Hanifin stated that they would like to negotiate, and I told them that I wasn't interested in negotiating, and then they said, I be-lieve, that in that case we would have to have an election, and I said—which was all new to me; I didn't know what they particularly meant by that, and he explained to me that if they had authorization cards from 30% of the men, that they could file with the NLRB for an election, that if they won 51% of the votes, that they would then be the bargaining agent for the men. They were just getting ready to leave, almost in their car, when he explained that to me, and I said, 'Well, go ahead and file for your election.'

"Q. Did you ask him— A. I asked him when he told me—he then told me—I then asked him, 'Well, do you have 30% of the votes, authorization votes in this establishment?' and he said, 'Yes.' And I said, 'Well, may I see the cards, or will you tell me the names of those who authorized you to say that?' And he said, no, he wouldn't. I don't know the exact words he used, but he said no, he wouldn't. That was it. He wouldn't tell me or show me who they were.

"Q. Well, on that day, when earlier in the conversation you said to him you didn't need a union or words to that effect, at that time you didn't even ask his verification that he had 30% authorizations, did you? A. I didn't have the slightest inkling that he was prepared to negotiate.

"Q. Well, were you aware, or had you been informed by any of your men that either Mr. Gamble or Hanifin had been in there talking about them? A. Yes, Cotton had told me once or twice that the union men were active at the plant and I told Cotton that if he saw them again not to give them permission to talk to the men on my time, and I guess he never saw them again to tell them that.

"Q. In any event, on October 3rd, or whatever day it may have been, when you made the statement that you didn't need a union, you had no knowledge that they had signed anybody up? A. Not the slightest."

502

important because it is highly improbable that the Union representatives laboring under the impression that they lacked authority of representation would make "a clear and unequivocal demand for recognition" (The Solomon Company, 84 N.L.R.B. 26) to bargain "in respect to rates of pay, wages, hours of employment, or other conditions of employment." A refusal so to do, after proper demand, is necessary to constitute a violation of § 8(a) (1, 5) of the Act, 29 U.S.C.A. § 158(a) (1, 5).[3] Nowhere does it appear that the Union made any such proper demand. Its representatives talked to Sam Zall about consenting to representation without an election. Sam Zall refused. Such a conclusion is all the evidence supports.

 We think the Board's finding, which we designate number Two, that Zall violated § 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1),[4] is supported by substantial evidence. Zall had been put on notice subsequent to the meeting of October 3, 1950, of the Union's bargaining status as a result of its consultation with employees. Efforts were then made by Zall

to induce its employees to abandon the Union and to deal directly with it in the negotiation of a contract providing for increased wages and for overtime work. Zall succeeded in negotiating a contract. No contract in this field had theretofore existed between Zall and its employees. The fact that the Union had not requested bargaining did not constitute a defense for Zall's failure, (it then having knowledge of the Union's bargaining status) to consult with the Union before entering into bargaining negotiations with its employees with a view of changing the terms of employment. Its action constituted a violation of the Act. Medo Photo Supply Corp. v. N. L. R. B., 1944, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007.

The order of the Board is modified so as to eliminate therefrom all reference to a violation of § 8(a)(5) of the Act, 29 U.S.C.A. § 158(a)(5), and all requirements and directions to Zall based upon the Board's finding that Zall had violated said § 8(a)(5), and as so modified let the order be enforced.

3. "Sec. 8. (a) It shall be an unfair labor practice for an employer—
* * * * * *
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)."

"Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the

bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment."

4. "Rights of Employees
"Sec. 7. Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."