NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SCOTT & SCOTT, Respondent.

No. 15144.

United States Court of Appeals
Ninth Circuit.

May 15, 1957.

Theophil C. Kammholz, General Counsel. Stephen Leonard, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Samuel M. Singer, William J. Avrutis, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Doesburg, Goddess & Bowes, John H. Doesburg, Jr., Chicago, Ill., for respondent.

Before FEE and CHAMBERS, Circuit Judges, and YANKWICH, District Judge.

JAMES ALGER FEE, Circuit Judge.

The National Labor Relations Board has filed a petition for enforcement of an order issued against Scott & Scott, a partnership operating a small printing plant at Santa Monica, California.

In its order the Board, after a review of the rulings made by the Trial Examiner, affirmed these and adopted his findings, conclusions and recommendations. They concluded that respondent neglected a valid claim by the Union of majority status among the employees of its bindery unit and that the Union, by its presentation of a contract for perusal and for discussion, had signified its desire to negotiate for these employees. It was further found that the refusal by respondent to bargain was not motivated by any good faith doubt of the majority of the Union, but rather by a desire to gain time in which to destroy that majority and defeat it in election.

The Board also found that the loss of majority by the Union was to be ascribed to the unfair labor practices of respondent. In this context, by its announcement of irrevocable opposition to the Union, respondent was found to have coerced its employees. The Board found therefore that from March 25, 1953, the Union had made a valid claim of majority status in the bindery unit and also, by its presentation of a proposed contract, it signified a continuing desire to negotiate for these employees. Thus it was found that the ultimate loss of majority by the Union was to be charged to the unfair labor practices of respondent. There was a strike at the plant following the refusal of respondent to bargain, and the Board concluded that this incident was caused by an unfair labor practice.

The Board ultimately found that respondent refused to bargain with the International Brotherhood of Bookbinders, Local 63, AFL, while the latter was the representative of a majority of the employees of respondent. This unit was found to be appropriate. It was also found that, by solicitation and by remarks and action of management, employees were interfered with and coerced in the exercise of their statutory rights in violation of Section 8(a) (1) and (5) of the Act.[1]

The order of the Board requires respondent to cease and desist from the unfair labor practices found. Respondent is further directed to bargain with the Union upon request and to reinstate and make whole all strikers who have not yet been reinstated and to post the customary notices.

The first matter for consideration is whether the Union made a proper bargaining request at a time when the employer was required to accede by law. The evidence was sufficient for the Board to make the finding. On March 25, 1953, Stansbury, a Union representative, told Wesley Scott, one of the members of the partnership, respondent here, that the Union represented a majority and, after requesting that Scott consent to a Board conducted election, presented him with

---

1. 29 U.S.C.A. § 158(a) (1) and (5).

two copies of an agreement between the Union and a number of other printing establishments in the vicinity. There is objection that the Union representative did not designate the bindery department as the unit to which the contract would apply. There was, it is true, some ambiguity in the report of the conversation, but the Board was justified in finding that no one was in doubt as to which unit was intended. At the time of this demand, the employees in the unit who had authorized bargaining by the Union were three out of seven, but during the day negotiations had been going on with another employee, and that evening she signed an application for membership containing a designation of the Union as her bargaining representative.

At the time of the demand, therefore, there was no legal necessity for the employer to bargain. The Union did not then represent a majority of the non-supervisory employees. The question was consequently whether the request was ever effectually renewed after a majority had been attained by the Union. Our opinion in Zall v. National Labor Relations Board, 9 Cir., 202 F.2d 499, 502, teaches us that, if the Union failed to renew its request to bargain after receiving majority status, there would be no foundation for the order of the Board in this case.

This undoubtedly is a question of fact. In the elaborate and well considered report of the Trial Examiner, it was found as a fact that thereafter on two occasions the Union had renewed the demand after its majority status was unquestioned. The evidence shows that Wesley Scott called George Smith, a local representative, and invited him to a luncheon held on March 31, where there were four non-supervisory union employees in the unit as against one non-union. There was nothing apparently discussed at this meeting except the situation at the plant, and Smith said directly that Scott go ahead and sign the contract, as the latter knew that the Union had "a majority in your plant."

There is the suggestion that this was not sufficient, since Smith had told Scott, when first invited, that the matter was in the hands of Stansbury and that Smith had no authority to speak for the Union. We hold that the Board was justified in finding that this was a renewal of the request at a time when Scott was by law bound to accede.

Stansbury called again on April 9, when Scott told him that "there wasn't anything to be gained for the employees or for ourselves by signing that agreement or talking about the contract." Stansbury then asked if Scott would consent to an election, which the latter refused.

Accordingly, upon the next day the Union filed a petition for certification as representative of the bindery employees, and the Board duly notified respondent thereof. Afterward, Smith called upon Wesley Scott. Definitely at that time he asked Scott to recognize the Union and sign the contract. The latter refused on the ground that respondent would wait and see what the result of the election would be. Smith claimed to represent the bindery. Scott said he was not aware of that fact. Whereupon, Smith suggested this issue be resolved by a card check conducted by some impartial person, such as a clergyman or a lawyer. Scott refused. In this context, the Zall decision does not apply. The Board had excellent grounds for finding that the request was renewed. National Labor Relations Board v. W. T. Grant Co., 9 Cir., 199 F.2d 711, 712, certiorari denied 344 U.S. 928, 73 S.Ct. 497, 97 L.Ed. 714.

Unless the employer had a good faith doubt as to the claim of the Union that it had a majority, he has the duty to bargain and may not insist upon an election. National Labor Relations Board v. Trimfit of California, Inc., 9 Cir., 211 F.2d 206, 210. Under these circumstances, the argument of respondent that the Union never had a majority of the normal working force of the unit and only achieved a specious position of four union employees to one non-union,

by virtue of the fact that the plant was understaffed, is theoretical and hypertechnical. It was a question of fact upon the decision of which the Trial Examiner and the Board agreed. Therefore, we must affirm this finding.

█ The question of the good faith of respondent in refusing to bargain and their desire to destroy the majority status of the Union and defeat it in the election is, of course, a question of intent. The Trial Examiner had the real opportunity of appraising the witnesses, and his finding thereon, affirmed by the Board, must stand. Similarly, the findings as to the intent of the employer to coerce the employees, their acts and expressions tending to prove this and the results thereof in interfering with and coercing the employees must be left to the Trial Examiner. There is nothing in the record which compels this Court to hold these findings clearly erroneous. Nor are we left with any feeling that a mistake was here committed. As a result of the acts of respondent, the Union lost its majority status.

█ The sole question remaining is whether a strike which occurred after the Union had lost its majority was an economic strike or an unfair labor practice strike. As we read the record, respondent discharged Ross, the foreman of the bindery, on April 19, for interfering with the rights of employees. Two days later, on April 21, Stansbury spoke at a regular meeting of the Union and called for a strike vote. Although he reviewed the relations of respondent with the Union, the discharge of Ross was the sole factor which brought on the subsequent developments. The strike vote passed unanimously. Immediately thereafter, an unfair labor practice charge was filed with the Board, specifically setting up the discharge of Ross as the sole violation of the Act, although "other acts and practices" of respondent are thus vaguely referred to.

This charge was made under Section 8(a) (3). No charges of a definite nature were made of a violation of either Section 8(a) (1) or Section 8(a) (5).

The Union also withdrew its petition for an election, which was permitted without prejudice. The Union called the strike on May 18. At a later date, the Regional Director dismissed this charge relating to the discharge of Ross, for the reason that it was not violative of the Act.

There is no evidence that Stansbury or any one else told the Union of the attempts to coerce the employees which have now been found by the Board or that such occurrences had the least influence on the strike vote or were even generally known at the time. The mere recounting of a failure to bargain is not the announcement of an unfair labor practice. The Trial Examiner assumed for the sake of argument that the discharge of Ross was the motivation for the strike. The subsequent evidence before the Board must have established a causal connection between any unfair labor practice now found and the subsequent strike.

In Winter Garden Citrus Products Cooperative v. National Labor Relations Board, 5 Cir., 238 F.2d 128, upon finding that such causal connection was not shown, the court refused to enforce the order requiring reinstatement. A like result obtains where unfair labor practices are claimed to prolong a strike, and no causal relation between them is shown. National Labor Relations Board v. James Thompson & Co., 2 Cir., 208 F.2d 743, 749; National Labor Relations Board v. Jackson Press, Inc., 7 Cir., 201 F.2d 541, 546; National Labor Relations Board v. Crosby Chemicals, Inc., 5 Cir., 188 F.2d 91, 95. No view to the contrary is expressed in National Labor Relations Board v. West Coast Casket Co., 9 Cir., 205 F.2d 902, since that case merely holds that there was substantial evidence to support the finding of the Board that the strike was caused in part by an unfair labor practice.

The present theory of the Union that unfair practices entered into the calling of the strike is obviously an afterthought when other means had failed. This situation is similar to the facts of Winter

Garden Citrus Products Cooperative v. National Labor Relations Board, 5 Cir., 238 F.2d 128, 130, where two communications declaring that the strike was caused by an unfair labor practice:

" * * * were sent about half way between the beginning of the nine-day strike and the unconditional offer to return to work. The Trial Examiner found them quite convincing in establishing that the strike resulted in part from the labor practices outlined, and the Board likewise apparently accorded great weight to them. With this, we are not able to agree. Viewed in connection with the evidence as a whole of what was transpiring, these documents appear to be the self-serving actions of a man who saw his cause slipping and who set about, by the expedient of argumentative communications having no relevance to the situation of the parties or the status of the negotiations as depicted by the other credible testimony but at war therewith, in an attempt to salvage what he could from the ineffectual strike. Instead of strengthening the Board's conclusions, these communications have the effect of weakening them, it being clear that they were an ex parte effort to make a record by assuming an attitude which was inconsistent with other facts definitely established."

The expression of the Trial Examiner, which was affirmed by the Board, is inconclusive, argumentative and inconsequential. It is based upon a single statement of a highly partisan witness long after the event when everything was suggesting that this foundation be laid. From this single evidentiary fact, the Examiner, by hypothesis, rationalizes the conclusion that the strike had other contributing causes besides the discharge of Ross. The purported finding has no other support anywhere in the record.

On the contrary, the whole situation compels the finding that the discharge of Ross and that alone was the motivating reason for the strike. The discharge of Ross was on April 19. The strike vote was on April 21. Three days thereafter, on April 24, the representation petition of the Union was withdrawn. On April 24, the petition alleging the discharge of Ross as the sole specific ground for an unfair labor practice charge was filed. Scott had a right to fire Ross. The Regional Director of the Board so decided.

It was stipulated by the Union and Scott that representatives of the partnership and the Union conferred several times between April 21 and May 18, and thus a conditional agreement for an informal election was reached. There was therefore a meeting of the minds of the parties and a mutual understanding on this subject.

The strike occurred on May 18, which was twenty-eight days after its approval by the Union membership. There is no intervening cause shown in the record. The whole record points to the discharge of Ross as the sole cause of the strike. Any other inference or conclusion is clearly erroneous. The record as a whole compels the holding that a mistake has been made.

It is entirely unnecessary to conclude that the Union had abandoned its claims for representation or that a genuine representation question did not exist. This Court has already affirmed the findings of the Examiner and the Board upon the subject of representation and failure to bargain.

■ But, since we have held that there is no basis in the record for the finding that the strike was bottomed upon an unfair labor practice, the order of the Board is amended by striking out paragraphs 2(b), (c) and (d), which provide for reinstatement, back pay and related bookkeeping arrangements, respectively.

Thus amended, the order of the Board will be enforced.