NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BARNEY'S SUPERCENTER, INC.,
Respondent.

No. 13596.

United States Court of Appeals
Third Circuit.

Argued Oct. 5, 1961.

Decided Nov. 16, 1961.

**92**

Marion L. Griffin, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Attys. N. L. R. B., Washington, D. C., on the brief), for petitioner.

Jack J. Rosenberg, Pittsburgh, Pa., for respondent.

Before GOODRICH, STALEY and SMITH, Circuit Judges.

STALEY, Circuit Judge.

The National Labor Relations Board ("Board") seeks enforcement of an order issued against Barney's Supercenter, Inc. ("Barney") after finding that Barney violated various provisions of the National Labor Relations Act ("Act"), 29 U.S. C.A. § 151 et seq., to-wit, section 8(a) (5) and (1), by refusing to bargain with a majority union, section 8(a) (1) by unlawfully inhibiting union activity

through interrogation of employees, threats and promises, and lastly, section 8(a) (3) and (1) by failing to reinstate or place striking employees, who applied for reinstatement, on a preferential hiring list.[1] The order directed Barney to cease and desist from these unfair labor practices and affirmatively required it to recognize and bargain with Retail Clerks International Association, Retail Store Employees Local Union 1407, AFL-CIO ("union").

After only ten of Barney's twenty-six employees signed union authorization cards, representatives of the union visited Barney's on May 26, 1958, and spoke to the president, demanding recognition and negotiation of a collective bargaining agreement. The president replied that before any action could be taken the matter would first be discussed with his associates. By June 6, 1958, the union had secured five additional signatures, giving it a total of fifteen, which constituted a bare majority of one inasmuch as Barney had increased its work force to twenty-nine. On that day, a discussion took place between Ammond, the union's secretary-treasurer, and various officials of Barney. Recognition was not granted. Thereafter, seventeen employees met on June 15, 1958, and voted to strike. A picket line was formed later that day in front of Barney's place of business in Pittsburgh. The strike was unsuccessful and the pickets were withdrawn in February of 1959. Within a month after the strike began, Barney hired four new salesmen as replacements for the strikers and reinstated two strikers, while five other strikers unconditionally requested but were denied reinstatement.

Barney vigorously attacks the Board's order.[2] At the threshold, it con-

1. The trial examiner recommended that the unfair labor charges be dismissed. The Board, however, two members dissenting, refused to follow those recommendations and issued the order before us. 128 N.L. R.B. 1325 (1960).

2. At oral argument, Barney dropped its contention that the Board cannot retroac-

tively apply jurisdictional standards. Here, the Board had a $1,000,000 jurisdictional standard at the time the alleged unfair labor practices occurred, while Barney did an annual business of $950,-000. The Board subsequently reduced its standards to $500,000, and exercised its jurisdiction.

tends that the union did not represent an uncoerced majority because employee Hannon was falsely told by the union that a majority of Barney's employees had already signed authorization cards, and that he signed, thereby giving the union majority status, only because of reliance on this fact. This matter need not detain us long. The trial examiner evaluated and refused to believe Hannon's testimony on this point. We have said many times that credibility findings made in National Labor Relations Board proceedings will not be disturbed by us, N. L. R. B. v. Local 369, International Hod Carriers' Building and Common Laborers' Union, 240 F.2d 539 (C.A.3, 1956); N. L. R. B. v. Local 420, United Association of Journeymen and Apprentices of the Plumbing Industry, 239 F.2d 327 (C.A.3, 1956), and that finding is, we think, fully supported by the record.[3]

 The main point Barney makes is that it cannot be found guilty of a refusal to bargain since the union failed to make an unequivocal independent bargaining demand after receiving majority status. The parties agree that the following testimony of Ammond, the union's secretary-treasurer, referring to a statement he made on June 6, 1958, in the presence of Barney's officers and attorney, is crucial:

"A. I made the statement to the company, if they were sincere in its desire to have a proper agency handle the case, then we would of course investigate to see which Board did have the proper jurisdiction. I also again made the offer that I had the bargaining cards—authorization cards—with me, in number approximately sixteen,—and we would be willing to have a third impartial individual check against a payroll of the company and, if we represented a majority of the people, that the company recognize us. This was turned down."

Barney urges that this statement constituted, at best, a conditional demand offering it alternatives for determining the union's majority status, while the Board contends, and we believe correctly so, that a review of all the circumstances clearly supports the finding.

 A request to bargain need follow no specific form or be made in any specific words so long as there is a clear communication of meaning, and the employer understands that a demand is being made. Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (C.A.D.C.1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). This must be determined from a review of all the circumstances. Statements and acts of the union or the employer cannot be viewed in isolation, and events both prior and subsequent to the request by the union may be examined in making that determination. NLRB v. Scott & Scott, 245 F.2d 926 (C.A.9, 1957). One of the factors to be considered is whether the union made a request for bargaining even before it obtained a majority, for such a request, although invalid when made, certainly would be of significance in interpreting the acts of the parties once majority status is achieved. NLRB v. Scott & Scott, supra; Scobell Chemical Co. v. NLRB, 267 F.2d 922 (C.A.2, 1959).

The request of May 26, 1958, was a clear and unequivocal one. Although Barney was under no obligation to bar-

---

3. Hannon, when first called as a witness by the General Counsel, admitted that he signed the authorization card upon the union's request and was not cross examined by Barney's counsel concerning the alleged misrepresentation. Two weeks later he was recalled as a witness for Barney, and then testified as to the alleged misrepresentation. The trial examiner rejected this latter testimony as an afterthought. In addition, our review of the record shows that Hannon was one of the very few strikers that Barney reemployed, and further that on cross examination by the General Counsel Hannon testified as follows: "I can't remember the exact words, but that's why I was going along, because a majority was going —I mean I don't recall him saying he had the majority signed. He didn't actually say that, as far as I recall."

gain on that date, it certainly was aware that a claim for recognition had been made. As the Board cogently pointed out, Barney could not, in good faith, have regarded Ammond's statements of June 6 that he possessed sixteen authorization cards, which constituted a majority of the employees, and that the union was willing to submit to a check by an impartial third party, as an abandonment of the May 26 demand. The more reasonable interpretation of Ammond's statement is that it was a reiteration of the May 26 demand made after the union obtained majority status.

Barney's conduct after June 6 shows that it understood that the union had made a valid bargaining demand. On June 13, 1958, Barney's counsel offered to agree to a consent election among the salesmen only. Ammond refused the offer. Also, Barney insisted that a "proper agency" be called on to resolve the dispute with the union although it knew that neither the Pennsylvania State Labor Board nor the National Labor Relations Board would exercise jurisdiction. Certainly, after June 6, Barney had no reasonable basis for doubting the union's majority status and could not have insisted on a certification election. NLRB v. Epstein, 203 F.2d 482 (C.A.3, 1953), cert. denied, 347 U.S. 912, 74 S.Ct. 474, 98 L.Ed. 1068 (1954). Also, Ammond testified that one of Barney's officers told him during a conversation in front of Barney's that the union acted hastily after making a bargaining demand on its president and that the recognition issue should have been subjected to further discussion with Barney.

■ The June 15 strike is another factor. After that date, Barney clearly knew that the majority of its employees were requesting that it bargain with the union and enter into a contract as a way of settling the dispute. More than a majority of its employees picketed in front of the business establishment on the day the strike commenced. Legends on the signs that pickets carried during the strike said that Barney's employees, members of the employee union, No.

1407, were on strike for "better wages, better hours, better working conditions." Under these circumstances, the strike itself constituted an independent demand for recognition. See Scobell Chemical Co. v. NLRB, 267 F.2d 922.

Barney points to our decision in Summitt Mining Co. v. NLRB, 260 F.2d 894 (C.A.3, 1958), Kellow-Brown Printing Co., 105 NLRB 28 (1953), and The Solomon Co., 84 NLRB 226 (1949), to support its position. Those cases are clearly inapposite. In Summitt, the union gave the employer alternative means for resolving its majority status. One of those alternatives, a hearing before the National Labor Relations Board, was accepted and followed by the parties. In Kellow-Brown the parties actually agreed to a consent election, and nowhere does it appear that the union made a prior unconditional independent demand as was done here on May 26. In The Solomon Company, the union not only was uncertain of, but in fact did not have a majority.

■ Lastly, Barney contends that a finding that it unlawfully inhibited union activity is not supported by substantial evidence, that the statements or acts of its officers relied on by the Board were within the protection of Section 8(c), and in any event, they were isolated in nature. We do not agree.

The record shows that during a two-week period following the May 26 demand, Barney's general manager privately interviewed six employees in the president's office. One of the employees was told "You don't need anyone to represent you." Another employee testified that he was promised "that you get everything done right, but just don't join the union." After attending a union meeting, employee Burnstine was told that "if the union comes in here, you won't be able to work as many hours as you do * * * you won't be able to work as many days as you are working now, and if you need an extra week off, you won't be able to get it * * *." It was made clear to another employee that union membership could result in a pay

decrease. These statements were clearly outside the bounds of protected speech, and their frequency makes inapplicable the isolated-act cases Barney cites. E. g., Kincade v. American Casualty Co., 290 F.2d 210 (C.A.5, 1961).

Inasmuch as the strike was an unfair labor practice strike, the three striking salesmen are entitled to reinstatement upon unconditional application, and the two striking cashiers and such other strikers as apply for reemployment are entitled to reinstatement to their former or substantially equivalent positions, or to placement on a preferential hiring list.

A decree for enforcement of the order of the Board may be submitted.