**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WHITELIGHT PRODUCTS DIVISION OF WHITE METAL ROLLING AND STAMPING CORPORATION, Respondent.**

**UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 5870, 5877.

United States Court of Appeals First Circuit.

Jan. 15, 1962.

---

Melvin J. Welles, Atty., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., were on brief, for National Labor Relations Board.

Robert Abelow, New York City, with whom Marshall C. Berger, William J. Abelow and Weil, Gotshal & Manges, New York City, were on brief, for respondent in No. 5870.

Allan R. Rosenberg, Boston, Mass., for petitioner in No. 5877.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

These two matters were heard together. The first is a petition for enforcement of a Labor Board order against Whitelight Products Division of White Metal Rolling and Stamping Corp., a New York corporation, hereinafter employer, following a charge by the United Electrical, Radio & Machine Workers of America, hereinafter the union. The second is a petition by the union to review the dismissal of a portion of the complaint. All of the immediately significant events took place in North Walpole, New Hampshire, between Monday and Friday, August 15 to 19, 1960.

For many years employer had operated a mill in Brooklyn, New York. In 1959 it opened a plant in North Walpole to assemble various types of ladders from magnesium extrusions it produced in Brooklyn. Active operation commenced in March 1960. At this time the workers were inexperienced. By August 15 there were some twenty-four employees in the production and maintenance departments, having varying seniority. The morning of that day the largest of the three Brooklyn extrusion presses suffered a serious breakdown, forecasting a production shortage of several months. North Walpole was informed by telephone and advised to make plans for a reduction in personnel. Word of the breakdown spread through the plant. That afternoon one Belden, a production employee, telephoned the union, and on Tuesday and Wednesday morning eighteen of the employees signed authorization cards. Wednesday noon the union organizer and a committee of the employees, with Belden as chairman, called upon the plant manager and demanded recognition. The Board found that the organizer offered to show the cards, but that the manager's reply was that he would give an answer on Friday. He agreed to take no steps to interfere with the union in the meantime. That afternoon the manager summoned Belden to his office and made some legitimate inquiry about the union, and some that was illegitimate. He was informed that there would be a meeting of the committee at the home of one Smith that evening. That evening he twice drove by Smith's house. His testimony as to his reasons for doing so was not specifically contradicted or impeached.

On Thursday morning the manager engaged in what the trial examiner found to be highly improper vocal anti-union activity. Thursday afternoon he discharged Belden and Smith, and laid off four other employees. Five of these six were members of the committee. That same day the union filed a petition for certification. On Friday the manager stated that since the union had requested an election, this was its "answer," and that he would not recognize the union without the election. The union then filed the present charges, dismissing the certification proceedings.

After a three-day hearing the trial examiner found that the employer had discouraged membership in the union in violation of section 8(a) (3), 29 U.S. C.A. § 158(a) (3), had refused to bargain in accordance with 8(a) (5), and had engaged in unfair labor practices within the meaning of section 8(a) (1). He recommended an order compelling the employer to bargain with the union and to reinstate the two discharged and four laid-off employees with back pay. The Board affirmed all findings, except as to Belden. Before us the employer criticizes many of the findings and all of the conclusions, and particularly attacks the order that it should bargain with the union in the absence of any prior certification. The union complains because the trial examiner's finding in favor of Belden was rejected by the Board.

■ The underlying basis for the trial examiner's decision was his opinion that the plant manager's testimony was wholly unreliable. In large measure we are not unsympathetic with that determination, but we believe that the examiner allowed his not unnatural distaste to get the better of his judgment. This caused him to disregard what seem to us inescapable facts, and to make findings either not supported by the evidence or in some instances contrary thereto. However, we cannot at all accept the employer's contention that it engaged in no improper activities. To do so we would have to say that the Board, as matter of law, must treat statements such as there will be no merit raises if the union comes in, and instead of

monthly raises a single raise once a year which will be five cents, and that the plant would operate only eight months instead of twelve, as benign observations of fact. There is no evidence that they had any factual basis. The employer overestimates our credulity.[1]

■ Furthermore, the Board was warranted in finding that the manager's refusal to recognize the union on Wednesday, when it offered the card check, was a violation of section 8(a) (5). N. L. R. B. v. Hamilton, 10 Cir., 1955, 220 F.2d 492; N. L. R. B v. Scott & Scott, 9 Cir., 1957, 245 F.2d 926. It did not cease to become such by the union's filing a certification petition, or by its dismissing it. N. L. R. B. v. Kobritz, 1 Cir., 1951, 193 F.2d 8; N. L. R. B. v. Sunrise Lumber & Trim Corp., 2 Cir., 1957, 241 F.2d 620, cert. den. 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34. Even bona fide doubts by the employer, which the Board did not find, that this was a "true" majority, rather than the result of a "whirlwind campaign" which would not be the final, considered view of its employees, are not the sort of doubts that would permit a failure to deal in the meantime. N. L. R. B. v. Lovvorn, 5 Cir., 1949, 172 F.2d 293. This latter claim is particularly hollow coming from an employer who set up a whirlwind campaign of its own, comprised of substantial unfair labor practices.

■ In the face of a long history of decisions to the contrary, the employer takes the position that ordering it to bargain with a union which has not been

---

1. The employer seems correct with respect to one small matter of no particular importance except that it was reflected in the proposed order. We agree that the finding of "surveillance" of the Wednesday evening meeting was something blown up out of proportion. The examiner found that the manager "drove slowly by [twice], each time looking in." No one testified he looked in. One of the two witnesses who saw him pass stated that he appeared to be "just driving around waiting for somebody." This was not evidence of apprehension. There was no

contradiction of the testimony that this was a street on which it was natural to be. In the case which the Board cites, N. L. R. B. v. Vermont American Furniture Corp., 2 Cir., 1950, 182 F.2d 842, there was a substantial surveillance which the Board found was for the purpose of discovering the identity of the active employees. Here the manager had already been given this information. On the record before us there is no reason for interpreting this casual passing as surveillance.

certified or recognized, as matter of law thwarts, rather than effectuates, the policies of the Act. It is true that in International Ladies' Garment Workers' Union v. N. L. R. B., 1961, 366 U.S. 731, 81 S.Ct. 603, 6 L.Ed.2d 762, the court held that it was an unfair labor practice even in good faith to recognize and bargain with a union which proved not to represent the majority of the employees. In that case, as in this one, there was no competing union, but the court held that the actions of the union and the company deprived the employee majority of its right not to be represented. There is a substantial factual difference here where eighteen of the twenty-four employees had signed cards. The employer's seeming solicitude for those who wanted to "refrain" from unionization, based on an unproven suspicion that a majority would conclude to do so after they had realized their precipitancy, cannot change black into white. It has been held that even where the employer's suspicions afterward prove correct, in that the union lost its majority without any other inducement or activity on the part of the employer, the Board may still remedy the employer's unfair labor practice in initially refusing to bargain with the displaced union by an order to do so. N. L. R. B. v. Armco Drainage & Metal Products, Inc., 6 Cir., 1955, 220 F.2d 573, cert. den. 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748; N. L. R. B. v. Stow Mfg. Co., 2 Cir., 1954, 217 F.2d 900, cert. den. 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751; but cf. N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1960, 281 F.2d 89; N. L. R. B. v. Superior Fireproof Door & Sash Co., 2 Cir., 1961, 289 F.2d 713. This is part and parcel of the doctrine that the employer must be governed by the situation as it exists at the moment. Cf. International Ladies' Garment Workers' Union v. N. L. R. B., supra. The employees' right to refrain from joining any

union cannot be twisted into a right on the part of the employer to say, when they do join, that they did not really mean it. Cf. N. L. R. B. v. Geigy Co., 9 Cir., 1954, 211 F.2d 553. *A fortiori*, the employer cannot avoid an order to deal with the union by asserting its loss of majority when that loss (if it occurred at all) followed unfair labor practices by the employer directed to that very end. N. L. R. B. v. Hamilton, supra.

We turn to more specific matters. The trial examiner found that the discharges of Belden and Smith on Thursday were unfair labor practices. The finding as to Smith was fairly warranted, and requires no discussion. The Board reversed as to Belden. We will treat this subsequently.

The examiner found that the layoff of three of the remaining committee members and one other was a further unfair labor practice. The employer counters by saying that these layoffs were because of anticipated loss of basic material from the Brooklyn mill due to the breakdown of the extrusion press, and that each of these four employees was the junior in point of service in his respective department. It was known from the beginning that repair of the press would take months. In point of fact it required nine. As we read the trial examiner's report, recognizing his obligation to weigh the employer's explanation, N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883, he did so by meeting it head on by a determination that no layoffs were necessary. He gave three reasons. The first was a certain difference in testimony between the North Walpole manager and the responsible official in Brooklyn. This difference existed. Possibly it was relevant to the exact timing of the layoffs, but we see no other relevancy. The examiner's finding was not rested on the timing.[2] Secondly, the examiner noted

2. If there had been a finding based upon the employer's choosing that particular Thursday, we might have supported it. However, such a conclusion would have

involved disputed questions of fact. We will not resolve them ourselves. Consequently, we cannot support a finding based on another ground simply because

discrepancies in the figures relating to previous shipments from the Brooklyn plant. Even resolving all discrepancies against the employer does not, in our opinion, support the examiner's conclusion. Thirdly, the examiner found that it was "admitted that there was no reduction in force at the Brooklyn plant." Even were this true, we would see no possible relevance. However, there was in fact no such admission. On the contrary, the undisputed evidence was that in Brooklyn there was one layoff, and that five employees and two supervisors left and were not replaced. But of paramount importance, ignored by the examiner, is the fact that in addition to the two discharges and four layoffs at North Walpole now in question, four other employees left and were not replaced. The finding that production did not warrant any layoffs not only is without support, but is totally contradicted. Whether the layoffs were nevertheless an unfair labor practice for some other reason may be given further consideration by the Board.

The final matter is the discharge of Belden. Belden had been employed 2½ months. In his application for employment he represented that he had been honorably discharged from the Air Force after four years' service. In fact he had served fourteen months, and his discharge had been less than honorable, possibly dishonorable. He left blank the answer to the question, "Records of all arrests (date, place of arrest, offense charged, disposition of case):" although agreeing that "any misleading or any incorrect statements * * * would be cause for immediate dismissal. * *" In fact he had been in a reform school for one conviction of breaking and en-

tering and was on probation following a second. The employer discovered the falsity of the military history shortly before August 15 and received information sufficient to pursue the other matter. On August 18 it learned the facts as to the criminal record.[3] The trial examiner found that Belden's misrepresentations and criminal record were a pretext for his discharge, and that the real reason was his chairmanship of the union committee. The Board, however, concluded, "We cannot say that Belden was discharged for other than a valid reason."

■ It is reasonable to believe that any employer would want to discharge Belden, not just for his rather significant criminal record, which might be overlooked if he was a good probationer, but for his deceit, which gave added testimony to the continued moral risk. We think the trial examiner treated this matter too lightly. At the same time it is not altogether easy to agree with the Board's quoted language. In the light of the discharge of Smith it might seem reasonable to infer that Belden would have been discharged even if no legitimate reason existed. On the other hand it has been held that some valid reasons are so strong as to override any other. N.L.R.B. v. Hudson Pulp & Paper Corp., 5 Cir., 1960, 273 F.2d 660; but cf. N. L. R. B. v. Jamestown Sterling Corp., 2 Cir., 1954, 211 F.2d 725. In this case we do not feel that we must make fine distinctions, nor explore the degree to which we may reverse findings of the Board. The Board asks that if we reverse as to Belden we do not require that it order financial relief and reinstatement because of the unreasonableness of requiring the employer to re-employ him. Under the circumstances we think justice

---

it could have been rested on this one. Furthermore, this change of ground might affect the relief. If these men, lacking seniority in their jobs, were about to be laid off legitimately, anyway, they are not now entitled to full back pay. Cf. N. L. R. B. v. Corning Glass Works, 1 Cir., 1961, 293 F.2d 784.

**3.** Actually, the manager testified in great detail that he learned of the criminal

record on August 16 and made up his mind on that date that Belden should be discharged. The purpose of this testimony was to support the claim that the discharge was unconnected with the union's activities, which were unknown on August 16. The complete falsity of this testimony was established by the telephone company's records.

will be adequately accomplished by not disturbing the Board's finding.

In No. 5870 a decree will be entered enforcing the order of the Board except as to the provision with respect to surveillance and except as to the four laid-off employees. The case is returned to the Board with respect to said employees for further proceedings not inconsistent with this opinion.

In No. 5877 a decree will be entered denying the petition to review and set aside.