**STEEL CITY TRANSPORT, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 16718.

United States Court of Appeals
Third Circuit.

Argued Dec. 7, 1967.

Decided Feb. 21, 1968.

Charles R. Volk, Thorp, Reed & Armstrong, Pittsburgh, Pa. (Donald W. Ebbert, Pittsburgh, Pa., on the brief), for petitioner.

Elliott Moore, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., on the brief), for respondent.

Before KALODNER, HASTIE and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

This is a petition for review and cross-petition for enforcement of an or-

der of the National Labor Relations Board ("Board") directing petitioner corporation ("petitioner") to bargain collectively with General Teamsters, Chauffeurs and Helpers Local 249 ("Union"). The Board's order is based upon an examiner's finding, adopted by the Board, that petitioner violated Section 8 (a) (1) and (5) of the National Labor Relations Act ("Act") [1] by refusing to bargain collectively with the Union.

Petitioner is a motor common carrier operating in the states of Pennsylvania and Ohio under a Certificate of Public Convenience and Necessity issued to it by the Interstate Commerce Commission ("I. C. C."). Under the bargaining unit found by the Board we are concerned only with "all single owner-operators and non-owner drivers of leased equipment, excluding multi-equipment owner-operators * * *."

Petitioner's primary contention is that the Board erred in determining that individuals in a bargaining unit consisting of truck owner-operators and non-owner drivers of leased equipment ("drivers") were its employees, and thus subject to the Act, and not excluded independent contractors. We turn first to the controlling law on this issue.

Whatever might have been the formulation of the governing legal principle before the 1947 amendment to the National Labor Relations Act (29 U.S.C. § 152(3)), it is now established, at least insofar as this Circuit is concerned, that the employee versus independent contractor issue under the Act is to be determined by the application of common law principles of agency. NLRB v. Keystone Floors, Inc., 306 F.2d 560 (3rd Cir. 1962). This renders the "right to control" test one of means for resolving such issue. NLRB v. Nu-Car Carriers, 189 F.2d 756 (3rd Cir. 1951); cert. denied 342 U.S. 919, 72 S.Ct. 367, 96 L. Ed. 687 (1952). We do not understand that petitioner quarrels with this statement of the controlling law. Rather, it argues that in applying such principles to the facts the Board over-emphasized the "right to control" test.

Considering the record as a whole we think the facts give substantial support to the Board's conclusion that the members of the bargaining unit are employees, and that it did not give undue weight to the right to control. Petitioner's relationship with its drivers is governed by identical lease provisions covering each piece of equipment leased to it. These leases are for an indefinite period until breached or, with 30 days notice, may be terminated by either party; and are exclusive, with a failure by the lessor to furnish equipment, or a use of equipment by the lessor for another carrier tantamount to a breach. Petitioner, pursuant to the terms of the lease, has exclusive possession, control, use and responsibility of the leased equipment. The lease also requires the equipment owners to provide their own drivers and the petitioner, as required by I.C.C. regulations, has all drivers, whether they drive their own equipment or are in the employment of others, complete a comprehensive employment application. The application notes that applicant, if hired, shall be subject to a 30 day probationary period, and that misrepresentation will constitute grounds for immediate discharge.

All drivers must pass a physical examination before they can haul for petitioner. Petitioner supplies the forms for the driver's physician to complete, and, in order to comply with I.C.C. regulations, the drivers must thereafter carry a doctor's certificate and pass subsequent physical examinations every 3 years. Petitioner's mechanic conducts an inspection of each driver's equipment at least every three months in order to comply with I.C.C. regulations. If any equipment is found to be defective, no new loads are assigned to the driver until the defect is corrected. Daily log sheets must be submitted by all drivers to the dispatcher at the end of every haul. If these sheets are not currently maintained, the dispatcher denies the

---

1. 29 U.S.C. 158(a) (1) and (5).

drivers further loads and refuses to pay them for past loads. All equipment leased to petitioner must bear petitioner's decal and I.C.C. and state certificate numbers. A "Markell Road Sticker" is placed on all equipment leased to petitioner. This sticker enables a safety inspection firm hired by petitioner to conduct on-the-road safety checks of petitioner's drivers and equipment.

Although not fixed in the lease, the drivers are paid a percentage of the gross receipts received by petitioner for each haul. This percentage is based on the type of equipment leased to petitioner. Although the drivers are told when engaged exactly what this percentage will be, it has been unilaterally cut by the petitioner. The rates charged customers are generally known by the driver before a haul, but these rates have also been cut after a haul without the knowledge of the driver until he seeks to collect his compensation for the haul. Drivers who meet a safety standard receive a cash bonus every six months. They also have received jackets with petitioner's name and other gifts at Christmas. Petitioner also gives cash advances and loans to its drivers to help pay their trip expenses.

In dispatching drivers, petitioner's dispatcher assigns loads on a first come, first served basis. If a driver is unable to haul on a specific day due to illness or mechanical failure he is required to notify the dispatcher. Although drivers can refuse hauls, at least one case was brought to the attention of the Board where a driver was told by the dispatcher regarding a haul that "it was either Columbus or nothing." Occasionally the dispatcher will specify the time for a pick-up or delivery of a load. The drivers generally choose their own routes. An exception to this is that all drivers must return through the Pittsburgh commercial zone following a pick-up or delivery at seven designated points outside the commercial zone. Upon completion of a run, the drivers are instructed to call petitioner collect for further assignments. Any use by the driver of equipment leased to petitioner for a load from another hauler must be approved in advance by petitioner. Petitioner will receive the check from the other hauler for the trip and endorse it over to the driver. A bunkroom facility is maintained by petitioner for the use of the drivers. Petitioner provides sheets and a janitress to maintain the facility.

We think the foregoing facts indicate the material nature of petitioner's continuing control over both the amount of compensation and the working conditions of the unit members, to say nothing of the equipment involved. Clearly as to non-owner drivers the factors strongly support the Board's conclusion. Considering the purpose of the Act in conjunction with their relationship to petitioner, we think the same is true of the owner-drivers. Certainly the fact that the leases recited that the parties intended to create an independent contractor relationship is not decisive. See NLRB v. Keystone Floors, Inc., above. The facts here point more strongly to an employer-employee relationship than those in NLRB v. Nu-Car Carriers, where a similar Board holding was enforced.

Petitioner places great reliance on United States v. Silk, 331 U.S. 704, 67 S. Ct. 1463, 91 L.Ed. 1757 (1947). However, the facts there pointed much more strongly toward an independent contractor status. Indeed, it was distinguished even from the facts in NLRB v. Nu-Car Carriers, above, which involved, in our opinion, a "closer" factual case than that now before the court.

Petitioner contends that many of the factors relied upon as showing its right of control were based on requirements of the Interstate Commerce Commission's regulations. Certainly this is so as to several such factors, but we think they were a relevant part of the totality of circumstances from which the "employee" determination was properly made. They were by no means "artificial" factors. Rather, they had direct and important consequences on the safe-

ty and efficiency of the petitioner's operation.

Petitioner contends that National Van Lines Inc. v. NLRB, 273 F.2d 402 (7th Cir. 1960) is almost exactly in point and arrives at a result contrary to that reached by the Board here. Certain factual distinctions between this case and National Van Lines may be noted. There the contract was to provide services. There was no lease of equipment. For their services the contract drivers were compensated, as set forth in the agreement, at a specified percentage of the tariff revenue received by National Van Lines. Here we have a lease of equipment and the compensation is not fixed in the lease. We think these distinctions are material, particularly in view of the actual control here asserted by petitioner. In any event, we believe the Board's conclusion here must be upheld under the controlling review standards because it finds substantial evidentiary support when the record is considered as a whole.

■ We conclude that the Board's determination that the members of the defined unit were petitioner's employees for purposes of the Act must stand.

We next consider petitioner's contention that the Board's order should not be enforced because the proof did not support its conclusion that the Union presented the petitioner with an unequivocal demand to bargain.

■ Before a violation of Section 8(a) (5) of the Act can be found, there must be a demand by the Union to bargain. See NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 297, 59 S.Ct. 501, 83 L.Ed. 660 (1939). This demand need not follow a prescribed form so long as it is clear from the attendant circumstances that there is a "clear communication of meaning, and the employer understands that a demand is being made." NLRB v. Barney's Supercenter, 296 F.2d 91, 93 (3rd Cir. 1961). The acts of the Union and the employer at the time the demand is alleged to have been made are not to be viewed in isolation. Events subsequent to the request may be examined in making the determination. NLRB v. Barney's Supercenter, above.

In October or November of 1965, Slayer, one of the petitioner's drivers, requested Reed, the Union's business agent, to send him application cards for membership in the Union. From then until June 1966, Slayer and other drivers solicited signatures from other drivers. At a meeting petitioner's drivers held on June 18, 1965, Slayer turned over to Reed approximately 50 application cards. At this meeting it was suggested that Reed approach Paul Brandt, petitioner's president, to seek recognition of the Union. A meeting was arranged between Brandt and Reed on June 27, 1965. At the meeting Reed told Brandt that the Union desired to represent petitioner's drivers. He also testified that he told Brandt that he had cards from approximately 50 of the 76 drivers. Brandt denied that part of Reed's testimony. The examiner and the Board found it unnecessary to resolve this conflict. It is clear, however, that Brandt did not raise any question at the meeting as to the majority status of those drivers represented by Reed. Brandt stated that he believed the drivers were independent contractors and that they should have an opportunity to express their desires by a secret election.[2] Reed then discussed petitioner's percentage rates which determine the drivers' earnings, and just prior to the termination of the meeting he gave Brandt a copy of the Union's "over-the-road agreement" and a "Steel Addendum."

Another meeting was held on July 15, 1965, at the request of petitioner's president, and was attended by Reed and others. Its purpose was to enable Reed to answer questions with respect to the agreement given to Brandt at the previous meeting. There was no discussion of the cards, and the parties agreed to hold a later meeting. At this later meeting, July 27, 1965, Brandt informed Reed that

---

**2.** If, as the Examiner noted, they were independent contractors no issue of an election would be involved.

he was going to consult petitioner's directors and at a later date would report on whether petitioner would negotiate or go to the Labor Board. Reed asked Brandt why he would go to the Labor Board if the Union already represented a majority of the drivers. Brandt replied that "there was a possibility that some of the people who signed application cards to join 249 [the Union] had changed their minds." Brandt consulted petitioner's directors, and they voted to proceed to a Board election on the ground that the drivers were not employees but independent contractors.

When Reed was notified of the Directors' decision he filed a petition for election. This petition was subsequently withdrawn when Reed discovered that petitioner would not consent to an election since it believed the drivers were independent contractors and not employees. The charges at issue were then filed.

■ There is no question but that at the June 27 meeting, the Union's representative presented petitioner's president with a copy of the "over-the-road agreement" with a "Steel Addendum." Whether petitioner's president accepted this out of his claimed curiosity or out of a sincere desire to discuss working conditions and other problems of the drivers is not important. What is significant is that, through its president, petitioner should have been aware that the presentation of the agreement with a Steel Addendum was a request to bargain. This conclusion is reinforced by what occurred at a subsequent meeting. Petitioner's president requested the meeting held on July 15 for the admitted purpose of meeting with the representatives of the Union to discuss the agreement he had received at the meeting on June 27. Finally, it is difficult to believe that these meetings, particularly in view of the typical bargaining-type matters discussed, were understood by petitioner's representatives to be something less than a demand to bargain. The Board's conclusion must stand.

We next consider petitioner's contention that the Board erred in denying its request for a secret election.

■ The record as a whole indicates, and the Board found, that the petitioner's representatives never manifested a good faith doubt of the Union's majority status. Petitioner's rejection of the Union's demand for recognition was based solely on petitioner's contention that its drivers were independent contractors and not employees. This erroneous view of the law is not now available as a defense to a refusal to bargain. See NLRB v. Keystone Floors, Inc., above. This is not a case where the Board was presented with evidence which required it to determine whether the petitioner entertained a good faith doubt as to the Union's majority status. Certainly the suggestion that some drivers who signed cards might have changed their minds is not such evidence. The issue now tendered by petitioner suffers from the infirmity of being a legal afterthought.

The petitioner's petition to review and set aside is denied, and the Board's request for enforcement is granted.