**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ERIE MARINE, INC., DIVISION OF LITTON INDUSTRIES, Respondent.**

No. 71–2099.

United States Court of Appeals, Third Circuit.

Argued May 26, 1972.

Decided Aug. 2, 1972.

Allen Feldman, N.L.R.B., Washington, D. C., for petitioner.

M. J. Diederich, Beverly Hills, Cal., for respondent.

Before STALEY, ALDISERT and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

The controlling question here is whether substantial evidence in the record supports the National Labor Relations Board's ("Board") findings that Erie Marine, Inc., ("Erie Marine") violated Sections 8(a) (1) and 8(a) (2) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a) (1) and (2). The Board seeks enforcement of its order.

Erie Marine is a division of Litton Industries, engaged in the construction of marine vessels in Erie, Pennsylvania. In the summer of 1969, after having apparently received numerous complaints from its employees concerning the company's prevailing wage policies, Erie Marine formed what it characterized as a Communications Sessions Committee ("Committee")—composed of representatives of employees and management.

In February of 1970, Erie Marine learned that the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers ("Union") would attempt to organize the plant's employees. The company sought to counteract the Union's efforts, and various subsequent incidents form the basis of the Section 8(a) (1) charges.

After a review of the Hearing Examiner's report, the Board concluded that Erie Marine had, in fact, violated Sections 8(a) (1) and 8(a) (2) of the Act.[1]

## I

Section 8(a) (1) prohibits an employer from interfering with, restraining or coercing his employees in their exercise of rights guaranteed by Section 7 of the Act.[2] The Board determined that three incidents were violative of Section 8(a) (1).

(A) On February 1970, Erie Marine received written notice from the Union informing the Company of its pending organizational drive and stating that thirteen employees had agreed to become voluntary organizers. Included in this group was Richard Kaizer, who, on that day, had occasion to confront Richard Lindstrom, a company supervisor, on the union issue. According to Kaizer's testimony, Lindstrom:

"said that I was out of my head for getting involved in something like this. That I was jeopardizing my job and future at Erie Marine, having anything to do with the union. . . . He stated that if a union did get in that the employees wouldn't benefit from it. That all the employees, the wages and the benefits would be taken away and renegotiated and everybody would be starting from scratch. He stated that something like $3.00 an hour or less that everybody would be making." (App., p. 63).

On the same occasion Kaizer was also told by a second company supervisor that Erie Marine would refuse to negotiate with the Union and that it "wouldn't allow any Union in the company." (App., p. 65).

(B) On February 19, 1970, Erie Marine called a meeting of all employees on its second shift. According to the testimony of Bobby Watts, an employee attending that meeting, company official John Kotyuk stated:

"if we got a union in, a union couldn't do us any good. The only thing the union could do was do us harm, because we would lose our seniority, insurance and everything we had and we would have to bargain all over again." (App., p. 68).

(C) At this same meeting, supervisor Robert Shasteen addressed the assembled employees. His comments were to the effect that Erie Marine did not need a union, that there would be layoffs instead of job rotations, and that:

"the wages and benefits that they had then would be scratched off and they would sit down at the bargaining table and draw up a whole new line of contracts and it would be possible for them to come out with less than they had at the present time." (App., pp. 76-7).

■ Initially, the Board reasonably concluded that Lindstrom's comments to Kaizer were, in fact, coercive. See N.L.R.B. v. Barney's Supercenter Inc., 296 F.2d 91, 94-95 (3d Cir. 1961);[3] N.L.R.B. v. Clapper's Mfg., Inc., 458 F. 2d 414 (3d Cir. 1972).

Further, the Board properly found that in the context of the Company-called meeting, management's statements concerning loss of benefits were not "carefully phrased on the basis of objective fact," but rather were statements carrying implications that management would "take action solely on [its] own initiative for reasons unrelated to economic necessities and known

1. The Board also dismissed a number of charges alleging other instances of Sections 8(a) (1) and 8(a) (3) violations.

2. 29 U.S.C. § 157.

3. Although Erie Marine contends that Kaizer's testimony should be discounted, we have often noted that it is the Board's

function and responsibility to resolve issues of credibility. Valley Forge Flag Co. v. N.L.R.B., 364 F.2d 310 (3d Cir. 1966); N.L.R.B. v. Wings & Wheels Inc., 324 F.2d 495, 496 (3d Cir. 1963); N.L. R.B. v. S.E. Nichols-Dover Inc., 414 F.2d 561, 562 (3d Cir. 1969), cert. denied, 397 U.S. 916, 90 S.Ct. 919, 25 L.Ed.2d 96 (1969).

only to [it]." N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

We conclude that the evidence taken as a whole provides a substantial basis for the Board's finding of a Section 8(a) (1) violation. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951).

## II

■ We similarly decline to upset the Board's finding that Erie Marine violated Section 8(a) (2) through its domination of the Communications Sessions Committee. The Hearing Examiner recommended and the Board ordered that the company withdraw recognition and completely disestablish the Committee as a representative employee committee. We agree.

Section 8(a) (2) of the Act makes it an unfair labor practice for an employer "to dominate or to interfere with the . . . administration of any labor organization or contribute financial or other support to it."

From its inception in July of 1969, the Committee's existence was dependent upon the Company. It had neither formal structure nor any real power to conduct its affairs in the absence of management's direction. Meetings were called by the Company, held on Company time, at the plant, and with full management participation. Notwithstanding Erie Marine's control and domination, the Committee did in fact "deal"[4] with the company on such issues as wages, seniority, and overtime, as well as other traditional employee concerns.

At oral argument counsel for Erie Marine conceded that the record supports the Board's finding of a Section 8(a) (2) violation for the period July-December, 1969. Nevertheless, it is urged that there is no "substantial evidence" of company dominance and control for the six-month period immediately preceding the filing of the Board's complaint on July 22, 1972, as necessitated by Section 10(b) of the Act. That section reads, in pertinent part:

"[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made. . . ."

In Local Lodge No. 1424 v. N.L.R.B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), the Supreme Court discussed the applicability of Section 10(b) in two distinct contexts:

"The first is one where occurrences within the six month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful." 362 U.S. at 416-417, 80 S.Ct. at 826 (footnote omitted).

Here the record reveals clearly that the Committee existed during the limitation period, that it met on a number of

---

4. In N.L.R.B. v. Cabot Carbon Co., 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959), the Supreme Court held that an "employee committee" which exists for the purpose "in part at least" of deal-

ing with an employer is a "labor organization" even if it does not bargain with the employer in the usual sense of collective bargaining. 360 U.S. at 213, 79 S.Ct. 1015, 3 L.Ed.2d 1175.

occasions, that its structure had remained unchanged and that the company exerted a similar degree of control as it had in 1969. Further, contrary to Erie Marine's contentions, there is substantial evidence that the Committee did "deal" with management concerning, *inter alia*, the desirability of a company credit union as well as Erie Marine's sick pay policies. We conclude therefore that the principal support for the Board's findings comes from the existence of the Committee and its domination by management within the limitations period.

The order will be enforced.