**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AL BRYANT, INC., Harrisburg Drywall and Construction Corporation, and Al Bryant Associates, Inc., Respondents.**

No. 82–3169.

United States Court of Appeals, Third Circuit.

Argued Jan. 13, 1983.

Decided June 30, 1983.

Catherine Garcia (argued), Elliott Moore, Deputy Associate Gen. Counsel; William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Thomas A. Beckley (argued), Jeffrey W. Davis, Beckley & Madden, Harrisburg, Pa., for respondents.

Before WEIS, SLOVITER and BECKER, Circuit Judges.

**OPINION OF THE COURT**
SLOVITER, Circuit Judge.

I.

INTRODUCTION

The National Labor Relations Board (Board) petitions for enforcement of its order directing respondents Al Bryant, Inc. (ABI), Harrisburg Drywall and Construction Corp. (Harrisburg Drywall), and Al Bryant Associates, Inc. (Associates) to cease and desist from refusing to bargain collectively with the two charging unions, to recognize the two unions, to apply the relevant bargaining agreement terms to employees of Harrisburg Drywall and Associates, to make those employees whole for loss of earnings or compensation, to reimburse employee trust funds, and to post a specified notice.

ABI was formed by Albert Bryant in 1967 and operated as an interior design and finishing contractor, engaged in hanging drywall, installing ceilings and laying floors. During the relevant period, Bryant owned 90% of ABI and served as president; his wife owned the remaining 10% and served as treasurer. Jean Hoffman, the office manager, was the secretary. The office was located in Harrisburg, Pennsylvania in a building owned by the Bryants.

ABI was a member of the Central Pennsylvania Subcontractors Association (CPSA), which conducted labor negotiations for its employer members and which negotiated agreements with both charging unions, the United Brotherhood of Carpenters & Joiners of America, Carpenters' District Council of Western Pennsylvania (Western) and Keystone District Council (Keystone). The two unions operate in different geographic areas. The ALJ found that ABI was bound by these agreements; this fact is apparently not disputed on appeal.

In 1971, a drywall finishing business known as Harrisburg Drywall and Construction Corp. operated by Geno Premici was incorporated, and Bryant acquired 51% ownership and became vice-president and

secretary. Jean Hoffman, ABI's secretary, became Harrisburg Drywall's treasurer. The following year, Bryant became sole owner. In 1975, Bryant selected Charles May, ABI's field supervisor, to be Harrisburg Drywall's president. Harrisburg Drywall did not adhere to any labor agreements in performing its work. Bryant used the two companies to maintain a "double breasted" operation, one whereby different legal entities in the construction industry with common proprietary and managerial aspects operate separately, one on a union and the other on a nonunion basis.

The third corporation, Al Bryant Associates, Inc., was formed in 1979 by Bryant, Larry McClain, ABI's coordinator, and Jean Hoffman, its office manager, after unfair labor practice charges had been filed against ABI and Harrisburg Drywall in connection with the nonunion operation of Harrisburg Drywall. McClain became its president, Bryant its treasurer and vice-president in charge of sales, and Hoffman its secretary and vice-president in charge of administration. McClain and Hoffman each contributed $20,000 in cash to Associates and received 35% stock ownership. Bryant contributed all Harrisburg Drywall's stock, valued at $40,000, for 30% ownership. Associates began operating January 1, 1980, as a subcontractor in the same business as ABI and Harrisburg Drywall.

This case centers on the interrelationship between these three entities, and the legal obligations which arise as a result. The unions charged that since respondents constituted a single employer, they violated sections 8(a)(5) and (1) of the National Labor Relations Act by refusing to recognize the charging unions and by refusing to apply to certain Harrisburg Drywall and Associates employees the collective bargaining agreement terms applicable to ABI. The Board's order was predicated on its findings, in substantial affirmance of the rulings, findings and conclusions of the ALJ, that all three respondents were a single employer, that Harrisburg Drywall was the alter ego of ABI, that Associates was the alter ego and "disguised continuance" of ABI and Harrisburg Drywall, and that the carpenter employees of all three companies constituted an appropriate unit for collective bargaining purposes.

The enforcement petition raises the following issues: (1) Were the initial charges filed by Keystone and the charges filed by Western time-barred by section 10(b) of the NLRA? (2) Should the Board have deferred to an arbitration decision made on Keystone's charges regarding the nonunion operation of Harrisburg Drywall? (3) Does substantial evidence support the Board's findings of single employer, unit determination, and alter ego? (4) Were respondents deprived of a fair hearing due to the ALJ's conduct?

## II.

### TIMELINESS OF THE CHARGES

Keystone filed its initial charge with the Board on August 10, 1979 in which it complained about Harrisburg Drywall's failure to honor the Keystone collective bargaining agreement. It charged ABI and Harrisburg Drywall with committing unfair labor practices by "hiring non-Union employees in contravention of its obligation under the collective bargaining agreement" and by "having a non-Union subsidiary and refusing to recognize the Union as a representative of the employees employed by Harrisburg Drywall." Keystone filed a second unfair labor practice charge on October 6, 1980, after Associates was formed. As amended, the charge alleged the three companies had "[s]ince on or about August 1980, ... refused to bargain collectively and in good faith with Keystone." Western filed its charge on October 3, 1979, claiming ABI "d/b/a Harrisburg Drywall" had "[s]ince on or about June 1, 1979, and at all times thereafter, ... failed and refused to bargain collectively and in good faith with [Western]."

Respondents argue that Western's charge and Keystone's initial charge were untimely under section 10(b) of the NLRA, 29 U.S.C. § 160(b), which provides "[t]hat no complaint shall issue based upon any unfair

labor practice occurring more than six months prior to the filing of the charge with the Board." Western knew by about January 1979, more than six months before it filed charges, that Harrisburg Drywall had been awarded a subcontract on a job in Venango County, Pennsylvania, a site within Western's geographic jurisdiction. A representative of that union telephoned Bryant requesting employment of union personnel and Bryant refused, stating he was doing the job under Harrisburg Drywall. Respondents contend that Bryant thus "repudiated" the contractual duties with respect to employees of Harrisburg Drywall, and that the section 10(b) period began to run when the repudiation was made known to the union.

The ALJ concluded that the section 10(b) six-month period did not begin until such time as Harrisburg Drywall commenced operations under employment terms distinct from those in the union contract.[1] The ALJ found that the record did not permit finding that Harrisburg Drywall actually commenced work at the Venango County job by April 3, 1979, the section 10(b) cut-off date for Western. That work apparently commenced about June 1979.

■ The ALJ's conclusion that the charge was timely filed is consistent with well-established legal principles. A statement of intent or threat to commit an unfair practice does not start the statutory six months running. The running of the limitations period can begin only when the unfair labor practice occurs. Thus in *NLRB v. Plumbers & Pipe Fitters Local Union 214,* 298 F.2d 427, 428 (7th Cir.1962), the court held that the actual date of the discharge of the nonunion employee, not the date the union demanded that he be discharged, started the statutory period. Similarly, when an unfair labor practice stemmed from denial of union membership to strikebreakers, the six-month period was counted from the date membership was denied, be-

cause that was the first date the employees could have filed their charge. *Local 1104, Communications Workers v. NLRB,* 520 F.2d 411, 415–16 (2d Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976). Since Western had no basis for filing a charge until work on the Venango County job began, its charge was timely.

■ Unlike the situation with Western, the ALJ found that "Keystone was mindful that its members had been employed by Harrisburg Drywall, that Harrisburg Drywall had performed work covered by the CPSA contract, that Harrisburg Drywall had not adhered to the terms of that contract, and that Al Bryant owned Harrisburg Drywall." The Board concedes that Keystone officials were aware of Harrisburg Drywall's operation as a nonunion shop within its geographic area more than six months before its August 10, 1979 charge was filed. The ALJ found, however, that respondents' obligation under the collective bargaining agreement was a continuing one. The fact that the initial repudiation of the agreement occurred more than six months before charges were filed did not absolve respondents from the unfair labor practices which inured from their continuing failure, on demand, to abide by the collective bargaining agreement. The ALJ found such a demand in a letter dated March 19, 1979 from Keystone informing Bryant that Harrisburg Drywall was covered by the applicable agreement and that it was obligated to adhere to its terms. Therefore, the ALJ found Bryant's failure to satisfy this demand constituted an independent violation of section 8(a)(5), thus rendering Keystone's August 10, 1979 charge timely.

As the respondents recognize, there does not appear to be any clear precedent on when the section 10(b) period begins to run with respect to section 8(a)(5) charges growing out of double breasted operations. Respondents contend that the most nearly

---

1. The ALJ also construed a statement by Bryant to a union representative in May 1979 as conveying the possibility that there would be further consideration given to the union's de-

mand. In light of our acceptance of the ALJ's principal grounds for finding the Western charge timely, we need not reach this additional reason.

analogous cases are those where the courts held that the refusal of an employer to execute an individual contract with the union following negotiations of a multiemployer pact marked the beginning of the six-month period. *See NLRB v. Serv-All Co.*, 491 F.2d 1273 (10th Cir.1974); *NLRB v. McCready & Sons, Inc.*, 482 F.2d 872 (6th Cir.1973); *NLRB v. Field & Sons, Inc.*, 462 F.2d 748 (1st Cir.1972). *But see NLRB v. Strong*, 386 F.2d 929, 931 (9th Cir.1967), *rev'd on other grounds*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969).[2] These cases have held a second or subsequent request by the union that the employer sign the agreement cannot support an unfair labor practice charge if the initial request and refusal to sign occurred outside the six-month statutory period. Similarly in *NLRB v. Pennwoven*, 194 F.2d 521 (3d Cir. 1952), we held that a discriminatory failure to recall employees because of their union activities initiated the six-month period. We stated that the fact that the employees wrote within the period demanding reinstatement did not trigger a new violation.

The Board, on the other hand, relies on cases holding each refusal to bargain by an employer under a general duty to bargain constitutes a separate violation. In *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 858 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978), for example, the court held that the passage of more than six months from one refusal to bargain does not bar action by the Board on a timely complaint based on subsequent refusal. The court reasoned that there was no danger of "stale" claims since a refusal to bargain violation is based on contemporaneous motives. The same principle was accepted in *NLRB v. Basic Wire Products, Inc.*, 516 F.2d 261, 267–68 (6th Cir.1975) and *Cone Mills Corp. v. NLRB*, 413 F.2d 445, 448–49 (4th Cir.1969) (applied to employer's refusal to provide union with information concerning pension plan). In *NLRB v. Louisiana Bunkers, Inc.*, 409 F.2d 1295, 1299–

1300 (5th Cir.1969), a case involving a single employer, the court found the charge was timely even though the initial refusal to bargain occurred outside the six-month period, because the employer refused subsequent union requests to bargain.

A decision on how to apply section 10(b) to the facts before us must be made in light of the statute's underlying policy. The Supreme Court has described the policy of the statutory time limit "to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused' " and "of course to stabilize existing bargaining relationships." *Local Lodge No. 1424, International Association of Machinists v. NLRB*, 362 U.S. 411, 419, 80 S.Ct. 822, 828, 4 L.Ed.2d 832 (1960) (*Bryan Manufacturing Co.*) (quoting H.R.Rep. No. 245, 80th Cong., 1st Sess. 40 (1947)). In *Bryan* the Court interpreted this section as precluding the filing of an unfair labor charge which was grounded on events predating the limitations period. That is not the situation before us. Here, there will be no need to rely on facts which predate the limitations period. Although there may be some evidentiary value to earlier events, this is not a situation "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice." *Bryan*, 362 U.S. at 416–17, 80 S.Ct. at 826–27. The relevant facts will be the interrelationships of the companies at the time of a specific demand to bargain, and these operative facts in no way depend upon any earlier demand to bargain.

We find support for the Board's position in the manner in which we applied section 10(b) in our earlier opinion in *NLRB v. Erie Marine, Inc.*, 465 F.2d 104 (3d Cir.1972). In that case, a section 8(a)(2) charge was based on a joint employee-employer committee formed in 1969. Although the complaint

2. The Board's position, which was accepted by the Ninth Circuit in *Strong,* is that a subsequent refusal to sign a labor contract within the section 10(b) period constitutes a continued refusal to bargain violation even if the initial refusal is outside the period. *See* Torrington Construction Co., 235 N.L.R.B. 1540, 1540 n. 2, 1545 (1978).

was not filed until July 22, 1972, we enforced the Board's order over respondent's reliance on section 10(b) because we concluded "that the principal support for the Board's findings comes from the existence of the Committee and its domination by management *within the limitations period.*" *Id.* at 108 (emphasis added).

Therefore, we believe the section 10(b) limitations period should be applied as it was in the *Erie Marine* case rather than in those cases cited by the respondents where the employer refused to sign a negotiated contract.[3] In the refusal to sign cases, the operative fact was a concrete act fixed in time in relationship to the facts surrounding the contract negotiations. As the court noted in *McCready,* "With the passage of time, those facts become harder to prove as memories fade and witnesses become unavailable." 482 F.2d at 875. No such concern is presented by the facts here, since the interrelationship between the entities can be established by reference to their status within the six-month period at the time of the relevant demand.[4] Here, Keystone asserted its position about Harrisburg Drywall's collective bargaining obligations in the March 19, 1979 letter. Therefore, its charge filed on August 10, 1979 was timely.

## III.

## DEFERRAL TO ARBITRATION DECISION

The March 19, 1979 letter to ABI by Keystone's counsel asserting Harrisburg Drywall was a "subsidiary" of or "joint venture" with ABI and that Harrisburg Drywall was obligated to apply the collective bargaining agreement negotiated between CPSA and Keystone resulted in an arbitration proceeding. Keystone presented to the arbitrator both its claim that Harrisburg Drywall, as a subsidiary of ABI, was bound to the CPSA agreement as a matter of contract and its claim that as a matter of federal labor law, the contract was binding on Harrisburg Drywall. The arbitrator found that Harrisburg Drywall was not a "subsidiary" of ABI within the meaning of the collective bargaining agreement and therefore ABI was not in violation of its contractual obligations to Keystone through Harrisburg Drywall's operation on an open shop basis. Respondents contend that the Board should have deferred to the arbitration decision denying Keystone's grievance.

Although not required to do so, *see, e.g., Herman Brothers, Inc. v. NLRB,* 658 F.2d 201, 205–06 (3d Cir.1981); *NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 678–79 (2d Cir. 1971), the Board has voluntarily decided not to exercise its plenary jurisdiction over all unfair labor practice charges and to defer to outstanding arbitration awards provided certain conditions were met: the arbitral proceeding was fair and regular, all parties agreed to be bound, and the decision was not repugnant to the purposes and policies of the NLRA. *Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080, 1082 (1955). A subsequently enunciated fourth condition, that the arbitrator must have considered and decided the statutory unfair labor practice issue, is the one at issue here. *See Raytheon Co.,* 140 N.L.R.B. 883, 884 (1963), *enforcement denied on other grounds,* 326 F.2d 471 (1st Cir.1964).

In this case, the arbitrator specifically stated that the basic question before him was whether Harrisburg Drywall was a subsidiary under the contract. He further stated his role was "limited to interpreting [the contract terms], and it [did] not extend to enforcing the provisions of the Labor Management Relations Act."

The Board decided that deferral was unwarranted. It explained:

> The arbitrator ... found that the NLRB and court cases cited to him by the Union were not enlightening as to the definition

---

**3.** In adopting this approach, we need not rely on any continuing violation theory. *See J. Ray McDermott & Co. v. NLRB,* 571 F.2d at 858.

**4.** As the Board recognized, the remedy is to be limited to six months before filing of the charge and, as it ordered in the case of Keystone, can in no event precede the date of the demand within that period.

of a "subsidiary" and thus he relied on dictionary definitions. Based on the tenor of the arbitrator's entire decision, it is clear he did not consider the statutory issue. It is also clear that the arbitrator did not have the same evidence before him as in the instant case. For example, he had neither the employment rosters of Harrisburg Drywall nor any information that Bryant signed bids for Harrisburg Drywall.

We have recently reiterated that we review the Board's decision not to defer to an arbitration award on an abuse of discretion standard. *See United Parcel Service, Inc. v. NLRB,* 706 F.2d 972, 981 (3d Cir.1983); *Herman Brothers, Inc. v. NLRB,* 658 F.2d at 207; *NLRB v. General Warehouse Corp.,* 643 F.2d 965, 970 (3d Cir.1981). Respondents argue that the reasons advanced by the Board are insubstantial, and therefore it abused its discretion. Respondents rely on cases in which the Board deferred to an arbitrator's decision although the arbitrator did not explicitly resolve the statutory issue. *See Atlantic Steel Co.,* 245 N.L.R.B. 814 (1979); *Kansas City Star Co.,* 236 N.L.R.B. 866 (1978). In those cases, the Board found the arbitrator considered all the evidence relevant to the statutory issue, and hence implicitly resolved it. In neither of those cases did the arbitrator explicitly decline to resolve the statutory issue, as he did here. Nor, in those cases, did respondents fail to provide significant relevant evidence at the time of arbitration in contrast to the situation here where, as the Board claims, "the companies refused to produce any subpoenaed documentary evidence concerning Harrisburg Drywall during the arbitration proceeding." Brief for NLRB at 38 (citation omitted).

■ The requirement that the statutory issues have been presented to and decided by the arbitrator is of particular significance to insure that the Board does not abdicate its responsibility to protect statutory rights. *See NLRB v. General Warehouse Corp.,* 643 F.2d at 969. The Board recently reaffirmed it would not defer "unless the unfair labor practice issue before the Board was both presented to and considered by the arbitrator." *Suburban Motor Freight, Inc.,* 247 N.L.R.B. 146, 146–47 (1980). Given the arbitrator's explicit statement that he was not resolving the statutory issue, and the fact that he did not have all the relevant evidence before him, we cannot hold that the Board abused its discretion in refusing to defer to the arbitral award. *See Monsanto Chemical Co.,* 130 N.L.R.B. 1097, 1099 (1961) (refusal to defer where arbitrator explicitly declined to pass on statutory issue although submitted to him).

## IV.

### THE FINDINGS OF SINGLE EMPLOYER, UNIT DETERMINATION, AND ALTER EGO

■ We turn then to the respondents' challenge on the principal issue decided by the Board, which agreed with the ALJ's finding that ABI and Harrisburg Drywall were a single employer, that Harrisburg Drywall was ABI's alter ego, and that Associates was the alter ego and disguised continuance of its predecessors ABI and Harrisburg Drywall. Because of unique problems in the construction industry, the Board will accept a double breasted operation under certain circumstances. However, an employer will be guilty of a failure to bargain violation for a double breasted operation if the Board finds that both entities are a single employer within the meaning of the NLRA and the combined employees form an appropriate bargaining unit. *See South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers,* 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam). The bargaining unit issue need not arise when there has been an alter ego finding, at least in the situation where a successor company is the "disguised continuance" of its predecessor. In *NLRB v. Scott Printing Corp.,* 612 F.2d 783 (3d Cir.1979), we upheld the Board's finding that a section 8(a)(5) violation could occur where a new employer was found to be the disguised continuance of the old employer without inquiring into the

appropriateness of the bargaining unit. See also *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 508–09 (5th Cir.1982) (Board will generally not consider the unit except to the extent it is repugnant to NLRA policy); Comment, *Double-Breasted Operations in the Construction Industry: A Search for Concrete Guidelines,* 6 U. Dayton L.Rev. 45, 47 (1981) (hereafter Dayton Comment).

**A. *ABI and Harrisburg Drywall as a Single Employer***

■ Four criteria have been used by the Board in determining whether separate entities constitute a single employer: interrelation of operations, common management, centralized control of labor relations, and common ownership. *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam); *see also NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1121–22 & 1121 n. 1 (3d Cir.1982); *Sakrete of Northern California, Inc. v. NLRB,* 332 F.2d 902, 905 n. 4 (9th Cir.1964), *cert. denied,* 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965); *Parklane Hosiery Co.,* 203 N.L.R.B. 597, 612 (1973). The Board finds no one factor controlling, although it has stressed the first three factors, particularly centralized control of labor relations, which tend to show "operational integration." *Id.; see also NLRB v. Jordan Bus Co.,* 380 F.2d 219, 222 (10th Cir.1967); *Parklane Hosiery Co.,* 203 N.L.R.B. at 612. Ultimately, single employer status depends on all the circumstances of the case and is characterized by absence of an "arm's length relationship found among unintegrated companies." *Local No. 627 International Union of Operating Engineers v. NLRB,* 518 F.2d 1040, 1045–46 (D.C.Cir. 1975), *aff'd on this issue per curiam sub nom. South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers,* 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *see NLRB v. Don Burgess Construction Corp.,* 596 F.2d 378, 384 (9th Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979).

■ The single employer question is primarily factual, and the Board's conclusion must be upheld if supported by substantial evidence. *NLRB v. Lantz,* 607 F.2d 290, 295 (9th Cir.1979); *see Suburban Transit Corp. v. NLRB,* 499 F.2d 78, 80 n. 1 (3d Cir.), *cert. denied,* 419 U.S. 1089, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974).

In a detailed discussion of the facts, the ALJ reviewed the ample evidence of the integration of the two entities. Harrisburg Drywall shared ABI's office building, equipment and personnel. "[T]he only assets of a corporeal nature retained by Harrisburg Drywall were a single, 1974 vintage van, and some office equipment inherited from Premici's firm. . . . Harrisburg Drywall had no warehouse, engineering, sales or clerical force, but individuals employed by ABI served the former's needs in these areas. All utility costs, including gasoline, electricity, telephones, incurred by Harrisburg Drywall and ABI were paid by ABI." There were no written agreements evidencing the "housing" arrangement or ABI's provision of equipment, administrative support and expenditures for overhead costs. Payment for rent and other overhead expenses, including headquarters' staff salaries, was made annually according to the gross volume of Harrisburg Drywall's business relative to ABI's, which the ALJ found was hardly indicative of "arm's length" dealing. The ALJ characterized Harrisburg Drywall "as a operational shell with no independent administrative capacity and little in the way of capital assets." He further stated, "this was complemented by integration of ABI resources upon the operations of Harrisburg Drywall at every level, from management to craftsmen who performed on the job site." Bryant performed many managerial functions for Harrisburg Drywall. Jean Hoffman signed checks and purchased supplies for Harrisburg Drywall. Larry McClain, ABI's coordinator, also served as Harrisburg Drywall's coordinator. Harrisburg Drywall's president, Charles May, was usually absent from the office, spending most of his time in the field super-

vising employees and performing carpentry tasks.

■ There is substantial evidence to support the ALJ's critical finding, affirmed by the Board, that the two companies shared centralized labor relations control. He found, for example, that

the integration of the two entities is further evidenced by the frequent and seemingly at random interchange of craftsmen as between Harrisburg Drywall and ABI. In several instances, carpenters would work for both firms during the same work week. This occurred in excess of 50 times in 1979, on 30 occasions in 1978, and in excess of 80 in 1977. On at least two occasions, the same employee worked for both firms in a single day. Carpenter Gulliver testified that the only way he could tell which firm he was working for was the designation on the payroll check. The lack of separate identity of the respective work forces of Harrisburg Drywall and ABI is indicated by the fact that in 1977, 10 of the 14 employees on the payroll of Harrisburg Drywall had also worked for ABI, in 1978, 8 Harrisburg Drywall employees had worked for ABI, while in 1979, 6 Harrisburg Drywall employees had also appeared on the payroll of ABI.

(footnotes omitted).

Respondents do not appear to seriously question the factual underpinnings which led the ALJ and the Board to conclude that ABI and Harrisburg Drywall were a single employer. Instead they argue that there is no evidence in the record to indicate that any work which was traditionally "union" work was transferred to the nonunion side of the double breasted operation, and they suggest that we should impose such a requirement before 8(a)(5) and (1) liability is imposed in double breasted cases. The Board authority upon which respondents rely, *United Constructors & Goodwin Construction Co.,* 233 N.L.R.B. 904 (1977), does not support the proposition. In the *United Constructors* case there were several factors which led the Board not to find a single employer in the double breasted context, including lack of participation of the first firm's owners in the day-to-day operation of second firm, lack of simultaneous supervision by the same personnel and use of written leases utilizing standard rates. As the foregoing discussion indicates, the ABI-Harrisburg Drywall situation presents far different facts.

We see no reason to adopt respondents' suggestion that "subterfuge" is necessary before finding that two employers are bound to each other's contracts. A contractor engaged in a double breasted operation has the best of both worlds, since it can bid through its union company when jobs require union contractors but can underbid a unionized company through its second operation on jobs that do not require union contractors. *See* Dayton Comment at 45–46. There is evidence in this case that that is precisely how Bryant used the ABI and Harrisburg Drywall companies. During the course of a meeting with union representatives Bryant stated he owned both a "union" and "open shop" company and that he would use the open shop company as "an alternative" if the unions "were going to force him to do so." Where the same employees can be and are, as in this case, switched back and forth between a union and nonunion payroll, the benefits which the employees reap from the union's collective bargaining can be diluted or dissipated. Furthermore, such an arrangement can generate confusion and disputes since the employee may be paid different wages, as occurred here, depending on which entity kept him on the payroll a particular day. The Board should be free to apply its expertise in the field of labor relations to hold that when the factual prerequisites of finding a single employer and appropriate unit are present, sections 8(a)(5) and (1) apply even without proof that union work was transferred to the nonunion side. No such requirement was suggested when the Supreme Court was presented with the single employer issue, *see South Prairie Construction Co. v. Local No. 627, supra,* and we decline to impose one.

B. *The Board's Unit Determination*

■ The Board recognizes sections 8(a)(5) and (1) of the Act apply to entities functioning as a single employer only if there is a finding that their aggregate employees constitute an appropriate bargaining unit. *See South Prairie Construction Co. v. Local No. 627,* 425 U.S. at 803–05, 96 S.Ct. at 1843–44; *see also NLRB v. Lantz,* 607 F.2d at 297. In this case the ALJ found that a unit consisting of the "carpenters employed by ABI and Harrisburg Drywall" was appropriate after considering "the functional integration of the operations, the similarity of the work performed and common skills of the employees, the extent of centralized management and supervision, the high incidence of temporary interchange, as well as centralized control of labor relations including the hiring and assignment of employees between jobs and firms." In affirming the ALJ's conclusion the Board also referred to the identical nature of the services provided.

The Board's determination of the scope of a bargaining unit will not be overturned by the court absent a finding "that the Board has acted in a manner that is 'unreasonable and arbitrary.'" *NLRB v. Saint Francis College,* 562 F.2d 246, 249 (3d Cir.1977).

■ Respondents argue that this unit determination was inappropriate because the Board allegedly failed to follow its decision in *A–1 Fire Protection, Inc.,* 250 N.L.R.B. 217 (1980), *remanded sub nom. Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 676 F.2d 826 (D.C.Cir.1982). In the *A–1* case, however, the Board had viewed the union's action in voluntarily acquiescing to the exclusion of one group of a single employer's employees from a collective bargaining agreement as a voluntary agreement on unit scope. Respondents here argue that because an agreement was negotiated with Keystone subsequent to Bryant's absorption of Harrisburg Drywall, the *A–1* case is applicable. The Board, however, distinguished the *A–1* situation on the

ground that Bryant, rather than frankly advising the union of his operation of Harrisburg Drywall at the time of the contract negotiations, instead concealed his operation and asserted that he had "nothing to do" with Harrisburg Drywall's operation and that he did not "run it." In light of this fact, the Board was not bound to find that the union "voluntarily acquiesced" in a unit determination which excluded the employees of the nonunion company.

Given our narrow scope of review over a unit determination and the substantial evidence on the record to support the Board's finding of an appropriate unit, we find no basis to overturn its conclusion that ABI and Harrisburg Drywall violated sections 8(a)(5) and (1) by failing to recognize the charging unions and failing to apply the negotiated agreements to the combined employees.[5]

C. *Associates as an Alter Ego*

Respondents argue that the Board's finding that Associates was the alter ego of ABI and Harrisburg Drywall is not supported by substantial evidence. "[T]he focus of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d at 508; *see also* Comment, *Dual Companies—When Does a Union Have the Right to Expanded Representation?,* 12 U.S.F.L.Rev. 89, 93 (1977).

Like the single employer finding, the finding that one company is the alter ego of another is a question of fact. *See Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942). The factors to which the Board looks are the substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between

---

5. Since we find there was substantial evidence to support the Board's conclusions that ABI and Harrisburg Drywall were a single employer

and that the bargaining unit was appropriate, we need not reach its finding that Harrisburg Drywall was ABI's alter ego.

the old and new corporations. *See Carpenters Local Union No. 1846,* 690 F.2d at 507. There is substantial evidence to support the finding that Associates is the alter ego in disguised continuance of ABI and Harrisburg Drywall. Associates was created to perform the same kind of work as ABI and Harrisburg Drywall. It occupied the same building, and shared some areas of its office and warehouse. It assumed the utility bills previously paid by ABI, rented ABI's office furniture, equipment and scaffolding, and employed substantially unchanged ABI staff. Five of the six nonmanagerial headquarters employees who had worked for ABI were transferred to Associates' payroll in the first week of its operation and the sixth was transferred shortly thereafter. Associates took its initial field staff from the other companies. ABI's three managers were transferred to Associates' payroll and continued to perform similar managerial functions in that capacity. Furthermore, it is significant, if not crucial, that Associates was created after the filing of unfair labor practice charges against ABI and Harrisburg Drywall, and substantial evidence supports the ALJ's finding that it was a "disguised continuance ... through which contractual obligations to Keystone and Western and putative statutory remedies were to be avoided." As the ALJ found, Associates

> was formed with knowledge of the labor difficulties and unfair labor practice charges confronting ABI and Harrisburg Drywall, and continued with an identical business purpose and objective. Administrative, managerial, sales, engineering, warehousing and clerical employees were simply removed from the payroll of one firm one day and appeared on the payroll of the other the next. For the first 5 months of its existence, [Associates] drew exclusively from the Harrisburg Drywall blue collar work force. Like Harrisburg Drywall, it utilized the equipment of ABI and shared administrative and clerical support with that firm.

Respondents dispute the characterization of Associates as the alter ego of the other two companies principally by objecting to the ALJ's finding that Bryant "continued to function as the principal source of [Associates'] policy and executive authority." This finding was based in part on the ALJ's credibility determination. In addition, there was evidence that Bryant spent up to five days a week in the joint ABI/Associates offices, that ABI's activities were practically at a standstill, that Bryant was frequently "consulted" about Associates' business, that Bryant's salary under a "consulting agreement" with Associates was twice that of its president, and that he exercised some supervision over sales personnel. This evidence supports the finding that Bryant retained sufficient control over the affairs of Associates to meet the alter ego criteria applied by this court in *NLRB v. Scott Printing Corp., supra.* As we indicated earlier, it is unnecessary to embark on a unit determination analysis once there is adequate evidence to support the finding that Associates was the alter ego of the other two companies.

Since we find that there was substantial evidence to support the Board's findings that ABI and Harrisburg Drywall were a single employer, that their carpenter employees constituted an appropriate bargaining unit, and that Associates was the alter ego of the other two companies, it follows that the Board's finding that respondents violated sections 8(a)(5) and (1) of the Act was proper.

## V.

### THE ALJ'S CONDUCT

The respondents' claim that the ALJ's conduct deprived them of a fair hearing. They complain that he evidenced hostility to Bryant and his attorney, that he seemingly had prejudged issues before all the evidence was in, and that he took on the qualities of an advocate in his examination of witnesses.

The Board considered this claim and concluded that, "[w]hile we believe some of the statements made by the Administrative Law Judge at the hearing may have been ill-chosen, upon our full review of the rec-

ord and the Decision of the Administrative Law Judge, we perceive no evidence that he prejudged the case, made prejudicial rulings, or demonstrated bias, hostility, and prejudice toward Respondents' counsel." The Board found no evidence of partiality in the ALJ's examination of respondents' witnesses or in his analysis and discussion of the evidence. The conduct of the ALJ did not in all instances project the image of a patient, impartial adjudicator. Nevertheless, the record does not establish that the respondents failed to receive a fair hearing.

## VI.

## CONCLUSION

For the foregoing reasons, we will grant the Board's application for enforcement of its order.