Bernard F. BYGOTT, Jr.; John Mahalis; John O'Toole; Gregory Patton, and Joseph Snyder

v.

LEASEWAY TRANSPORTATION COR-PORATION; Terminal Personnel, Inc.; Signal Delivery Service, Inc., and Highway Truck Drivers and Helpers Local 107.

Civ. A. No. 84–2229.

United States District Court, E.D. Pennsylvania.

Nov. 21, 1985.

Judith Chomsky, Ira Katz, Philadelphia, Pa., for plaintiffs.

Gregory J. Miller, Cleveland, Ohio, for Leaseway Transp. Corp.

Robert House, Cleveland, Ohio, for Terminal Personnel, Inc.

Thomas Bender, Philadelphia, Pa., for Signal Delivery Service, Inc.

William J. Einhorn, Philadelphia, Pa., for Highway Truck Drivers and Helpers Local 107.

## MEMORANDUM

BECHTLE, District Judge.

In the above captioned case, on September 23, 1985, the court denied motions for summary judgment by defendants Highway Truck Drivers and Helpers Local 107

("Local 107" or the "union"), Leaseway Transportation Corporation ("Leaseway"), Signal Delivery Service, Inc. ("Signal"), and Terminal Personnel, Inc. ("TPI"). The court found then that there were genuine issues of fact as to whether Local 107 fairly investigated and considered the possibility that TPI was an alter-ego of Leaseway or Signal, and that Signal and TPI were single employers.

In this memorandum, the court takes the opportunity to explain the reasoning underlying its September 23, 1985, Order.

FACTS:

Plaintiffs [1] are members of Local 107 and employees of Signal. Local 107 is the collective bargaining representative for the truck drivers and platform workers employed by Signal and for the truck drivers and platform workers employed by TPI in Philadelphia, Pennsylvania. Signal and TPI are subsidiaries of Leaseway. Eighty percent of Signal's stock shares is owned by Leaseway and twenty percent is owned by Sears, Roebuck & Company ("Sears"). All of TPI is owned by Leaseway.

At all times relevant to this case, Leaseway, Signal and TPI had several overlapping members on their Boards of Directors.[2] Charles Marcoux, President and Chief Operating Officer of Leaseway, was Chairman of the Boards of Directors of both Signal and TPI. Robert F. Weber was a member of the TPI and Signal Boards, Treasurer of both TPI and Signal, and a Vice-President at Signal. Robert M. Moss ("Moss") was on the TPI and Signal Boards. Moss was also a member of the Signal Board in 1979 when he directed for Leaseway the formation of TPI.

Leaseway created TPI in 1979. Since that time, TPI has provided only freight handling services for Terminal Freight

1. Plaintiffs are Bernard Bygott, John Mahalis, Gregory Patton, John O'Toole, and Joseph Snyder.

2. In 1983, Signal's Board consisted of Robert A. Burgin, Steven G. Goldfarb, Robert K. Healey, Richard C. Knapp, David A. Mackie, Charles R. Marcoux, Gerald C. McDonough, Charles F. Moran, Robert M. Moss, Stephen C. Nieman,

Francis J. O'Neill, William J. O'Neill, George Tidmarsh and Leonard P. Wander. TPI's Board for the same period was comprised by Charles R. Marcoux, Robert M. Moss, and Robert F. Weber. The court notes that each member of TPI's three-member Board were also members of Signal's fourteen member board.

Handling Company ("Terminal"). Terminal's only customer has been Sears.

Until December 31, 1982, most of the freight handling at Terminal's 2nd Street and Erie Avenue, Philadelphia facility ("Terminal's facility" or the "Terminal facility") was performed by employees of Joseph Tropiano ("Tropiano"). Signal provided the rest of the contract carrier services [3] to the Terminal facility. For several years, Signal had been attempting to displace Tropiano from Terminal's facility and to secure the freight handling for itself. In the early fall, 1982, Signal's, Maurice Ferraro ("Ferraro"), the regional manager and operating director, hoping that a new collective bargain agreement might make Signal more competitive for obtaining the Terminal facility work, contacted Local 107 to negotiate a new collective bargaining agreement between Signal and Local 107. At the several meetings which followed, in the fall, 1982, Ferraro told the persons attending the meetings, members of Signal's management personnel, the union's Mike Facchiano ("Facchiano") and Joseph Murphy ("Murphy"), and Signal's stewards, that in order to displace Tropiano the union would have to agree to an hourly rate less than that set by the National Master Freight Agreement and to a seniority list separate from the Master Line Haul Seniority List. Ferraro's proposal was discussed by the union members at a ratification meeting held in the first week of December, 1982. The union members did not consider the proposal to be worthy of a vote, and no vote was taken.

After the meeting, several union members, hoping that Signal could still secure the Terminal facility contract carrier work, urged Local 107 to continue negotiations with Signal. Signal and union officials continued to negotiate and the negotiations concluded with a second proposal. This proposal provided that the hourly wage rate would be higher than the rate proposed in the first proposal, but it would still be lower than the rate authorized by the National Master Freight Agreement. The second proposal also called for a separate seniority list, but unlike under the first proposal, Local 107 members would be permitted to bid annually in and out of positions covered by the seniority list. The second proposal was ratified by the union membership, and Signal and Local 107 entered into a collective bargaining agreement, effective from January 1, 1983 through March 31, 1985.[4]

Meanwhile, Signal displaced Tropiano and secured the contract carrier services at the Terminal facility.

Local 107's members on Signal's seniority list, which included plaintiffs John Mahalis ("Mahalis") and John O'Toole ("O'Toole"), were given the opportunity to bid for positions at Terminal's facility. The union members who were not on the seniority list were permitted to sign a "preference" slip to work at the Terminal's facility.

Both Mahalis and O'Toole bid into positions at Terminal's facility, but both bid out of the jobs prior to May 1, 1983. Plaintiffs Bernard Bygott ("Bygott"), Gregory Patton ("Patton") and Joseph Snyder ("Snyder"), who were in Signal's labor pool and not on Signal's seniority list, chose not to sign a "preference" slip.

Signal employees began handling the freight at Terminal's facility on January 1, 1983. In April, 1983, Terminal notified Signal that productivity, as measured in pounds per man hour, was unsatisfactorially low and that the workforce's turnover rate was unacceptably high. Signal, in turn, informed Local 107 of Terminal's dissatisfaction. The union responded that the bid provision would not be charged. The

---

**3.** The term contract carrier services is used to designate the service of providing freight handlers to trucking terminals.

**4.** The record does not reflect the dates of these events. The Court presumes that they occurred in December, 1982. Signal had been a party to the National Master Freight Agreement and the Philadelphia and Vicinity Local Cartage Supplemental Agreement since 1970.

union did not inform its membership of Terminal's complaints.

In the summer and fall, 1983, Signal attempted to investigate what could be done to improve its operations at the Terminal facility. Ferraro visited TPI's operation in Columbus, Ohio in the summer, 1983, and discussed the deficiencies of Signal's operations with Thomas Douglas ("Douglas"), TPI's Operations Manager. At TPI, Douglas had the authority to hire, fire, and discipline freight handlers. Before Ferraro returned to Philadelphia, John Caruso ("Caruso"), Douglas's supervisor, offered to permit Douglas to go to Philadelphia to observe and correct the situation at the Terminal facility. Douglas accepted this offer. He orally resigned from TPI and filed an application for employment at Signal. Signal hired Douglas, and Douglas began work in Philadelphia in September, 1983. The parties dispute whether Douglas became the terminal manager or the head supervisor at the Terminal facility. Defendants contend that Douglas had no authority to hire, fire or discipline freight handlers. Plaintiffs contend that Douglas had de facto authority to hire, fire, and discipline. Douglas received from Signal more benefits than he had received from TPI.

Terminal continued to be dissatisfied with Signal's performance. In a letter dated November 16, 1983 (the "Four Point letter"), Terminal informed Signal that Terminal intended to exercise its right to terminate the contract, effective December 31, 1983, unless Signal corrected four problems: (1) Signal's inability to provide a stable work force; (2) Signal's inability to maintain an acceptable level of productivity measured in pounds per man hour; (3) the turnover of Signal's experienced workers was unacceptably continuous; and (4) Signal's top management was not totally dedicated to Terminal's account.[5]

Subsequently, still in the middle of November, 1983, Terminal informed TPI that Terminal was prepared to terminate Signal's contract. Consequently, Caruso advised Ferraro that if TPI was awarded the work at Terminal's facility, TPI would be willing to assume the existing collective bargaining agreement between Signal and Local 107.

In late November, 1983, Signal officials met with union officials on one or two occasions.[6] Ferraro presented the Four Point letter to the union officials. He informed Local 107 that Signal could not totally devote its top management to the Terminal account and that Signal could not correct the situation before the end of 1983. Ferraro told the union that Signal, therefore, would permit Terminal to terminate the contract. He advised the union, however, that Terminal would award the carrier contract to TPI and that all Signal employees would have a one time opportunity to bid into TPI.

On December 1, 1983, Local 107 and Signal signed an agreement which permitted Signal employees a one-time opportunity to bid into TPI, and the union and TPI signed a collective bargaining agreement. The two agreements contained most of the same provisions, but the TPI-Local 107 agreement omitted the Signal-Local 107 agreement's provisions relating to the seniority list.[7]

5. The letter was addressed to Leonard P. Wander ("Wander") and apparently sent by William E. Moss. Wander was President and Board Member of Signal. William E. Moss was Terminal's President. Coincidentally, on November 16, 1983, the same day on which the letter was dated, Signal's Board of Directors had met, and that meeting was attended by Wander, William E. Moss and Robert Moss. Robert Moss was TPI's President.

6. The parties dispute whether there were one or two meetings. They also dispute the date of those meetings and the identities of the persons present at the meetings. The court believes that Ferraro and Robert Monahan, Signal's regional manager, was present on behalf of Signal. The record indicates, however, that Ferraro also represented TPI at the meeting. The court believes also that Local 107's business agents, Facchiano and Murphy, and several stewards appeared on behalf of the union.

7. Local 107 and TPI officials apparently did not meet to negotiate this collective bargaining agreement between the meeting in late November when Ferraro stated that Signal would not resolve the situation at Terminal's facility and

Although the bylaws of Local 107 require that all collective bargaining agreements and modifications be submitted to the membership for notification, neither the Signal-Local 107 agreement nor the TPI-Local 107 agreement was submitted for ratification.

Also, on December 1, 1983, notice was posted giving Signal employees a one-time opportunity to bid for eighty positions at TPI as freight handlers. Bidding was to be effectuated by completing and filing TPI employment applications. The notice stated that the right to bid terminated on December 15, 1983.

Fifty-six Signal employees bid into TPI. Each retained the same level and type of benefits which they had received at Signal, but they lost the right to seek reemployment at Signal.[8] The remaining positions were filled by persons not formerly associated with Signal. The personal records of the fifty-six persons who bid into TPI were not transferred from Signal to TPI.

Plaintiffs were given the opportunity to bid into TPI and chose not to do so.

TPI hired Douglas and five supervisors from Signal's Terminal facility operation.[9] Douglas acquired the authority to hire, fire, and discipline employees, and the supervisors retained at TPI the same authority which they had had at Signal. Douglas and the supervisors received the same benefits at TPI as they had received at Signal.

On January 1, 1984, TPI began handling freight at Terminal's facility, under an agreement between Terminal and TPI which was virtually the same as the one under which Terminal and Signal operated.

TPI performed the same services as Signal had performed, using essentially the same equipment, management personnel, and labor personnel as Signal had used. Also, TPI paid the same level and type of wages and benefits as Signal had paid.

On January 5, 1984, Thomas Lowry ("Lowry"), a Signal driver and shop steward, filed a grievance with Signal's Robert Monahan and Local 107's Thomas Ryan ("Ryan"). Lowry complained that Signal had violated the Change of Operations and Seniority provisions of the Signal-Local 107 collective bargaining agreement. One hundred nine Signal employees countersigned the grievance. Plaintiffs Bygott and Snyder signed the grievance, but Mahalis, O'Toole and Patton did not.

Ryan conducted the investigation of the grievance on behalf of Local 107. Ryan read the grievance and questioned Lowry about its background. Ryan testified at his deposition that he also obtained Dun and Bradstreet reports on Signal and TPI (the "D & B reports") of the business and financial operations of Leaseway, Signal, and TPI. Ryan then referred the grievance to the union's legal counsel ("counsel") for further investigation.

On January 17, 1983, counsel met with Local 107's stewards over breakfast to discuss a variety of matters, including the background of the complaint (the "breakfast meeting"). At that meeting or immediately thereafter, Lowry explained to counsel that Signal's operation at the Terminal facility was similar in many respects to TPI's present operation at that facility.

December 1, 1983 when Local 107 and TPI signed the collective bargaining agreement.

**8.** The Signal-Local 107 collective bargaining agreement had permitted 25% of Signal's work force at the Terminal facility to rebid jobs annually. In accordance with this arrangement between January 1, 1983 and April 29, 1983, seventeen workers had bid out of the Terminal facility operation. As early as April, 1983, Terminal believed that the rebidding provision handicapped the Terminal facility operation. An intercompany memorandum of Terminal, dated May 6, 1983, signed C.H. Feeney addressed to

W.J. Arigi, stated that labor productivity was low because of the rebidding provision. Under the new TPI-Terminal collective bargaining agreement, productivity was not hindered by the rebidding provision.

**9.** The parties dispute the number of supervisors employed by Signal at Terminal's facility. There may have been as few as six supervisors and as many as nine supervisors. The five supervisors who were hired by TPI were Joseph Sinnott, Dennis Gaitley, William Mychko, Jessi Yanni and Micahel Rossano.

Ryan and counsel drove to the Terminal facility in a snowstorm, but neither Ryan nor counsel got out of their cars or spoke to anyone else involved in the operation of Terminal's facility in connection with the Lowry grievance after the breakfast meeting. Also, neither Ryan nor counsel took a walking on-site inspection of the Terminal facility.

At the conclusion of its investigation, on January 23, 1983, counsel sent Local 107 a three-page letter (the "opinion letter") in which counsel expressed his opinion that the grievance lacked merit and recommended that the union not take the grievance to arbitration. In the opinion letter, counsel dismissed the viability of single employer or alter-ego theories against Signal, TPI and Leaseway as follows:

"While in this case Leaseway is the parent of Signal and Terminal Personnel, the two subsidiaries are—according to the best information currently available—two separate and distinct companies with separate lines of supervision, policy and personnel. Accordingly, the termination of a contract for the provision of services within those companies is not different than if a customer had terminated a contract with one company and placed it with an entirely different company...."

The union conducted no further factual or legal investigation nor did it process the grievance to arbitration nor did it advance the grievance in any way.

Shortly thereafter, plaintiffs filed this lawsuit against the union for breach of its duty of fair representation and against Leaseway, Signal, and TPI for breach of the collective bargaining agreement. At the conclusion of discovery, defendants filed the present motions.

Defendants argue that Local 107 fairly, and not arbitrarily or perfunctorily, investigated and considered the factual matter underlying the grievance. Defendants do not challenge in their motion plaintiffs' assertion that TPI is an alter ego of Leaseway and Signal or that TPI and Signal are single employers.

## DISCUSSION:

Defendants' motion for summary judgment will be granted if the court determines that there are no genuine issues of material fact remaining for trial and that the defendants are entitled to judgment as a matter of law. *Ely v. Hall's Motor Transit Company*, 590 F.2d 62, 66 (3d Cir. 1978); Fed.R.Civ.P. 56(c). In determining whether genuine issues of material facts exist for trial, the court will review the pleadings, depositions, answers to interrogatories, admissions and affidavits. Fed.R. Civ.P. 56(c). In deciding whether defendants are entitled to judgment as a matter of law, the court will resolve all inferences and questions of credibility against the defendants. *Smith v. Pittsburgh Gage and Supply Company*, 464 F.2d 870, 874 (3d Cir.1972).

A labor organization, such as Local 107, must represent its members fairly throughout the duration of the grievance procedure as outlined in the collective bargaining agreement. *Dorn v. Meyers Parking System*, 395 F.Supp. 779 (E.D.Pa.1975) (Bechtle, J.); 29 U.S.C. § 185. The union may not process a grievance in a manner which is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *See Electrical Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1970); *Peterson v. Lehigh Valley District Counsel*, 676 F.2d 81 (3d Cir.1982). In order to comply with this duty to fairly represent its members, the union must research and consider the factual and legal principles underlying the grievance in a manner which is not arbitrary, discriminatory, or in bad faith. *Findley v. Jones Motor Freight*, 639 F.2d 953, 959 (3d Cir.1981); *Ely v. Hall's Motor Transit Company*, 590 F.2d at 66.

Title 29 U.S.C. § 185, imposes upon labor organizations the duty to represent its members fairly. Union members have only a limited right of action against the union, however. That is, the courts are a proper forum to prosecute the grievance of

a member of a labor organization only where the union acted in an arbitrary, discriminatory, or bad faith manner. Where the union's conduct was merely negligent, mistaken or poor judgment, the courts will not interfere with the grievance procedure of the collective bargaining agreement. *Riley v. Carriers Local No. 380*, 668 F.2d 224 (3d Cir.1981).

In the present case, defendants are entitled to judgment as a matter of law, if, after resolving all inferences and questions against the defendants, the court finds that the facts undisputably establish that the defendants fairly investigated and considered all the legal and factual matters pertaining to the grievance. Applying this standard, the court believes, that as the union's investigation of the grievance progressed, it must have been apparent that whether the grievance had merit or not turned upon whether TPI was an alter-ego of Leaseway or Signal; or upon whether TPI and Signal were single employers.

The opinion letter expressly advised the union that the Lowry grievance was without merit only if Leaseway, Signal, and TPI were separate and different companies. In addition, Lowry specifically stated to Ryan and counsel at or after the breakfast meeting that the thrust of his grievance was that TPI's operation was only a continuation of the Signal operation, under different labels. Accordingly, Local 107 had the duty to investigate and consider fairly whether TPI was an alter ego of Leaseway or Signal and whether Signal and TPI were single employers.

The alter-ego doctrine is intended to prohibit an employer from avoiding its obligations under the labor laws by merely making a technical change in the structure or identity of the employing entity without making a meaningful change in ownership or management. *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974). Under the doctrine, the fact-finder must consider whether the first and second employer have a substantial identity of ownership, management, business purpose, operations, equipment, customers, and supervision. *N.L.R.B. v. Al Bryant, Inc.*, 711 F.2d 543, 553 (3d Cir.1983). If the fact-finder, after considering these factors, concludes that, although the two entities are actually distinct, the second employer is merely the first employer in disguise, technically and not meaningfully different, the court will treat the two entities as if they were one employer.

Under the single employer doctrine, if the fact-finder, after considering all the circumstances, determines that the two employers are in truth one enterprise, merely different divisions or departments which do not interact at arm's length, the original employer will not be permitted to avoid its obligations under the collective bargaining agreement. *N.L.R.B. v. Al Bryant*, 711 F.2d 543 (3d Cir.1983); *N.L.R.B. v. Browning-Ferris Industries*, 691 F.2d 1117 (3d Cir.1982). In order to make this determination, the fact-finder focuses on whether the companies' operations are functionally integrated, whether labor relations are centrally controlled, whether the companies have common management, and whether the companies have common ownership. *Id.* If the fact-finder, after considering these factors, determines that the employers are single employers, the employers will be barred from avoiding the effects of the labor laws.

In the present case, the court denied defendants' motions for summary judgment, on September 23, 1985, because it believed that whether the union fairly investigated and fairly considered whether TPI was an alter-ego of Leaseway or Signal and whether TPI and Signal are single employers is a genuine issue of a material fact that must be decided by a jury. Ryan, who investigated the Lowry grievance on behalf of the union, did not recall at his deposition, a year and a half after the investigation, to whom he talked in connection with the investigation, the number or dates of meetings he attended, the persons present at those meetings, or the matters discussed at the meetings. Ryan also was not aware that the persons who directed

and managed TPI's operation were the same persons who directed and managed Signal's operation. Although Ryan has testified that he ordered the D & B reports on Signal and TPI in the course of the investigation, plaintiffs have set forth evidence which casts doubt upon the credibility of this testimony. Defendants' answers to plaintiffs' interrogatories, requesting the specifics of Ryan's investigation, did not include the assertion that D & B reports were ordered by any union officials. In fact, Ryan's testimony that he ordered D & B reports did not emerge until the second day of Ryan's deposition, a month after the first day of Ryan's deposition. In addition, the opinion letter did not mention that the attorneys, making the recommendation to the union not to process the Lowry grievance, knew of or relied on the D & B reports.

Moreover, there is a genuine dispute as to whether Local 107 conducted an investigation or inspection of the Terminal facility which would have enabled the union to observe TPI's equipment, freight handling procedures, operations, management, and labor personnel to possibly learn if they were the same as that of Signal. Such a course may also have aided in determining if TPI's labor relations policy was similar to that of Signal's or that the source of TPI's labor relations policy was the same as the source of Signal's policy. Union officials and agents merely drove through the facility.[10] The court believes that a reasonable jury could find that Local 107 perfunctorily or arbitrarily undertook its investigation duty in violation of its obligation to provide fair representation.

Furthermore, the evidence presented as a whole does not conclusively show that the union fairly *considered* whether the TPI and Signal operations at the Terminal facility had the same management and labor personnel, used the same equipment, practiced the same freight handling procedures

and operations, and employed the same labor relations policy. The only evidence offered to show that the Union considered the similarities between Signal and TPI, was the comment in the opinion letter that, according to the best information currently available, TPI and Signal had different lines of supervision, policy, and personnel. Drawing all inferences in favor of the plaintiffs, the court believes that a reasonable jury could find that the union and its agents acted arbitrarily in not considering the evidence that Signal and TPI had the same management and labor personnel, the same operational and labor relations procedures, and the same equipment.

For these reasons, the court found that a genuine issue of whether the union fairly investigated and considered the Lowry grievance remained disputed and that a trial was necessary.

One final issue, raised by defendants, must be addressed. Defendants argue that Mahalis, O'Toole, and Patton failed to satisfy the exhaustion requirement because they did not countersign the Lowry grievance or file a grievance of their own. The court believes that the law is clear on this point. Where a union refuses to take a grievance of some of its members to arbitration, and it would be futile for other members to file a grievance on identical grounds, the other members should not be denied access to the courts for their failure to exhaust their contractual remedies on that grievance. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *Donovan v. International Brotherhood of Electrical Workers*, 728 F.2d 610 (3d Cir.1984); *Woodward Iron Company v. Ware*, 261 F.2d 138 (5th Cir.1958).

CONCLUSION:

For these reasons, the court, on September 23, 1985, denied defendants' motions

---

**10.** The Third Circuit has implied that a union, by investigating merely collateral issues and not investigating matters relating to the grievance, has not complied with its duty of fair representation. *See Findley,* 639 F.2d at 959. In this case, the jury could find that the union's investigation did not adequately look into certain important matters or did not look into other important matters at all. *See Ely,* 590 F.2d at 66 n. 10.

782

for summary judgment in the above-captioned case.[11]

---

**11.** On November 6, 1985, before this opinion was published, a jury rendered a verdict in this case. The jury, first, found that defendant Local 107 breached its duty of fair representation. Second, the jury found that Signal and TPI were not alter egos or single employers. Leaseway was dismissed as a defendant by the court at the close of plaintiff's case under Rule 50 of the Federal Rules of Civil Procedure.

In plaintiff's claim against the Union, there was sufficient evidence on the record for a reasonable jury to find that the Union had determined prior to its investigation that the Lowry grievance was without merit. In addition, there was sufficient evidence for a reasonable jury to find that even if the Union's determination that the grievance was without merit did not come until after its investigation, the Union perfunctorily and arbitrarily failed to investigate the grievance. Local 107 did not research to learn and compare the common features of Signal and TPI even though the Union's counsel had expressly advised the union that certain particular factors must be considered. The Union's investigators and counsel drove to the Terminal facility in January, 1983, in a snowstorm, but they did not drive or walk into or through the facility. Neither Local 107 investigators or counsel met or talked with anyone who worked at the Terminal facility after January 1, 1983. In brief, Local 107 did not take even the most minimal investigatory steps.